125 N.J. Super. 500 (1973)
311 A.2d 764
STATE OF NEW JERSEY, PLAINTIFF,
v.
THOMAS CONNERS, DEFENDANT.
Superior Court of New Jersey, Monmouth County Court, Criminal Division.
Decided November 13, 1973.
*501 Mr. Paul Feldman for defendant (Mr. Charles Frankel, attorney).
*502 Mr. John Mullaney, Assistant Prosecutor for the State (Mr. James W. Coleman, Jr., Prosecutor of Monmouth County, attorney).
YACCARINO, J.S.C., Temporarily Assigned,
Defendant appeals from a municipal court conviction of driving under the influence of intoxicating liquor in violation of N.J.S.A. 39:4-50(a). The appeal was heard de novo on the record.
On September 26, 1972 at approximately 5 P.M. Officer Capraun of the Manalapan Township Police Department was dispatched to the scene of an accident on Route 527 near Rifkins Farm. Upon his arrival at the scene the officer observed a truck lodged halfway into a house which was under construction.
Defendant, who was nearby, advised the officer that he had been driving the truck down the roadway when the door of the truck flew open, causing him to lose control of the vehicle.
The officer testified that he smelled an apparent odor of alcohol on defendant's breath. Defendant's eyes were bloodshot and glazed, his clothing was in disarray, his speech was slurred and he fumbled through his wallet in search of his license and registration. Defendant had to lean on the patrol car for balance. The officer also observed that defendant had visible scrapes and scratches about his face and elbow. The officer rendered on-the-scene first aid and then requested defendant to perform certain balance tests. Upon defendant's refusal he was placed under arrest for suspected drunken driving.
Defendant was taken to the Freehold Area Hospital for emergency treatment and thereafter to Manalapan Township Police Headquarters. During the ride from the hospital to headquarters defendant agreed to submit to a breathalyzer test. Upon arrival at headquarters the officer who was to conduct the test advised defendant that he did not have to take the test. Thereupon, defendant advised the officer that *503 he refused to submit to the test. Thereafter, defendant's wife arrived at police headquarters and sought to post bail, which had been fixed at $250. She talked to the police officers and then conferred with defendant, who reconsidered his refusal to take the test and "voluntarily" submitted to the examination. The breathalyzer reading was .26%.
What then followed was a rather bizarre course of conduct by the police which included, among other things, the police department's refusal to accept the cash bail they had fixed, the fingerprinting and photographing of defendant over his objection, the handcuffing of defendant to a post at headquarters, and the ultimate jailing of defendant at the Monmouth County Jail because of his refusal to sign an "arrest form." This conduct was later termed by the police chief as "standard procedure" for this type of motor vehicle violation.
Defendant explained his conduct as being the result of physical injuries sustained in the accident. With regard to the exceptionally high reading on the breathalyzer, defendant contends that it was caused by the spraying of his mouth with a breath spray that contained 34.6% alcohol prior to the test to eliminate mouth odor which might have affected the test results.
Defendant contends that the court should exclude the breathalyzer test readings because (1) there was no evidence that the machine was in proper working order, the inspection certificates being inadmissible hearsay; (2) his consent to submit to the test was the product of duress, thereby requiring the suppression of the readings, and (3) the manner in which the police obtained his consent was so unfair that it violated the "due process clause" and "fundamental fairness clause" of the Federal Constitution.
The State contends that the inspection certificates of operability are admissible, relying upon Evidence Rule 63(13). It further contends that defendant's consent was freely given and was not the product of duress.
*504 The court will first consider defendant's contention that the test readings were taken without his consent and should be suppressed.
Motions to suppress evidence which may be used against an accused in a municipal court proceeding are required to be heard in the Superior Court or County Court. R. 3:5-7. The failure to move timely to suppress the results, either before or during that trial, bars an application made for the first time on an appeal de novo on the record. State v. Swiderski, 94 N.J. Super. 14 (App. Div. 1967); State v. Ferrara, 81 N.J. Super. 213 (Cty. Ct. 1963).
The court will next consider defendant's contention that the machine testing results, called certificates of operability, were inadmissible.
During the trial the police officer who administered the test to defendant produced two certificates prepared by a State Police coordinator.[1] Over objection, they were received into evidence. The thrust of these certificates is that the officer tested the machine both before and after the time period in which defendant took the test, and the machine was found to be accurate. It is conceded by the state that, absent evidence that the machine was in good working order at the time that defendant took the test, the results or readings are inadmissible.
The use of the breathalyzer reading as reliable evidence was passed upon in State v. Johnson, 42 N.J. 146 (1964). There the court adopted the following statement from State v. Miller, 64 N.J. Super. 262, 268 (App. Div. 1960):
*505 The Drunkometer is sufficiently established and accepted as a scientifically reliable and accurate device for determining the alcoholic content of the blood to admit testimony of the reading obtained upon a properly conducted test, without any need for antecedent expert testimony by a scientist that such reading is a trustworthy index of blood alcohol, or why.
The Supreme Court set forth a caveat at the conclusion of its opinion:
It is, of course, most essential, in view of the heavy impact the result can have, that proper administration of the test be clearly established before the reading is admitted in evidence. This includes full proof that the equipment was in proper order, the operator qualified and the test given correctly (as well as the fact that the defendant consented orally or in writing). [42 N.J. at 171 emphasis added];
In order to understand what the Supreme Court meant by "full proof that the equipment was in proper order," it is necessary to consider the testimony upon which the court rested its opinion. An examination of the transcript of the testimony in Johnson reveals that Trooper Narcisco Chiappelli testified at length as to his testing of the accuracy and operability of the drunkometer machine at the time the test was administered to the defendant. He was cross-examined at length on this issue. Because the statute creates a presumption from the breathalyzer readings alone, it is imperative that the machine be in accurate working order.
In the case before this court the State contends that such proof is not necessary, but rather the certificates issued by the officer who conducts the before and after testing of the machine and concludes that it is in proper order are admissible in lieu of his testimony. The right of confrontation and cross-examination, therefore, rests upon a conclusion encapsuled in a "certification" that such are the facts. The State relies upon Evidence Rule 63(13), which provides as follows:
A writing offered as a memorandum or record of acts, conditions or events is admissible to prove the facts stated therein if the writing *506 or the record upon which it is based was made in the regular course of a business, at or about the time of the act, condition or event recorded, and if the sources of information from which it was made and the method and circumstances of its preparation were such as to justify its admission.
This rule is generally referred to as the business entry exception to the hearsay rule. This exception is generally limited to business records. "The rule reflects the realization that records trusted and relied upon by businessmen are indispensible in commercial litigation * * * Mahoney v. Minsky, 39 N.J. 208 (1963)." (N.J. Rules of Evidence (1972), at 264; section 63(13)-1, "History & Theory."; emphasis added); Records other than commercial payment records have been held to be within the rule. Some records of public agencies are admissible for specified purposes. See Sas v. Strelecki, 110 N.J. Super. 14 (App. Div. 1970); Fagan v. Newark, 78 N.J. Super. 294 (App. Div. 1963). The rule has been used to admit bank records in tax fraud cases, Zacher v. United States, 227 F.2d 219 (8 Cir.1955); Papadakis v. United States, 208 F.2d 945 (9 Cir.1953), and to admit photostatic copies of freight bills in a prosecution for improper transportation of dangerous explosives, West Coast Fast Freight v. United States, 205 F.2d 249 (9 Cir.1953). However, in Hartzog v. U.S., 217 F.2d 706 (4 Cir.1954), the court held that government work sheets used in the prosecution for income tax evasion were inadmissible because they were made in preparation for prosecution and because they were the product of the author's judgment and discretion and not the product of any efficient clerical system. The court stated:
There was no opportunity for anyone * * * to tell when an error or misstatement had been made. These worksheets were no more than Baynard's [the preparer of the worksheets] unsworn, unchecked version of what he thought Hartzog's records contained. Applying the criterion of the Hoffman case, that admissibility is to be determined by "the character of the records and their earmarks of reliability * * * acquired from their source and origin and the nature of their *507 compilation," Hoffman v. Palmer, 318 U.S. 109, at page 114, 63 S.Ct. 477, at page 480, 87 L.Ed. 645 we hold that these worksheets were inadmissible as evidence of the truth of their contents. (Citations omitted) [at 710]
It has not been suggested in this jurisdiction that the testing of a breathalyzer machine as to its proper working order can be proven by certificates. Admissibility of inspection certificates has been dealt with in other jurisdictions by statute (e.g., Pennsylvania Vehicle Code, 75 P.S. § 1002(d); see Commonwealth v. Parish, 138 Pa. Super. 593, 10 A.2d 896) (Super. Ct. 1940).
This case is of first impression in New Jersey, as there appears to be no reported case. This court cannot conceive of how this record of scientific conclusion can be admitted without proof of the accurate operability of the machine, especially when such admission creates a presumption at law carrying criminal sanctions (N.J.S.A. 39:4-50.1.) Inspection certificates have been admitted into evidence in Municipal and County Courts in the past. The rationale of these courts has been that the certificate is entered into evidence to show that on a certain date the breathalyzer was tested for accuracy and, as the State stated in its brief, "to reflect the results of the test." Without testimony and cross-examination of the coordinator who tested the machine, the certificate becomes the sole proof of the machine's accuracy, and in reality it is often accepted as the "full proof" required for conviction. Trial by this machine without proof of its accuracy holds no place in our system of jurisprudence.
Even if Evidence Rule 63(13) were applicable, which this court holds it is not, there was no required supporting testimony whatever that the record was made in the ordinary course of business.
This court has considered the applicability of Evidence Rule 63(16), which provides as follows:
Subject to Rule 64, a writing made as a record, report or finding of fact is admissible if (a) the maker was authorized by statute to *508 perform, to the exclusion of persons not so authorized, the functions reflected in the writing, and was required by statute to file in a designated public office a written report of specified matters relating to the performance of such functions, and (b) the writing was made and filed as required by the statute. [emphasis added]
This rule requires that the maker of the report be authorized by statute and that the writing was filed as required by statute. An examination of N.J.S.A. 39:4-50 et seq. reveals that there is no statutory authorization or requirement with reference to the testing of a breathalyzer or the filing of the test results. In addition, Rule 63 (16) is "subject to Rule 64." There is no evidence in the record which indicates that the notice requirement of Rule 64 was complied with.
It should be noted that the court, in answer to inquiry addressed to a deputy attorney general present in court on a like case, was advised that the Attorney General's office produces the coordinator in all cases where a breathalyzer test was administered and the results are to be offered into evidence.
The court, therefore, concludes that "full proof" as required by State v. Johnson, supra, 42 N.J. 146, is not satisfied by the introduction of certificates in lieu of testimony. Accordingly, defendant's objection is sustained, and the readings of the breath test are excluded from the court's consideration.
In light of the Court's ruling excluding the breath test, defendant's contention that his consent was the product of duress and the due process contention are moot.
The final issue deals with the question of whether the State, absent the breath test, has proved that defendant operated a vehicle while "under the influence," while "impaired," or neither. N.J.S.A. 39:4-50(a), (b).
While the cases are legion dealing with objective manifestations demonstrating "under the influence," there are no reported decisions dealing with objective signs or manifestations which distinguish "under the influence" from "impaired." The incorporation of the lesser offense "impaired" *509 requires a review and reassessment of prior decisions dealing with the single offense of "under the influence." At least one prior decision dealing with the issue of whether or not a defendant was driving "under the influence" held that a driver whose mental or physical faculties were "impaired" by the consumption of alcoholic beverage was operating a vehicle while under "the influence." State v. Ash, 21 N.J. Super. 469 (App. Div. 1952). Holdings of this nature are rendered nugatory by the adoption of the new offense of operating a vehicle "while impaired." N.J.S.A. 39:4-50(b).
In order to better understand the intendment of the new act it is necessary to examine its historical development.
The prohibition against drunken driving predates the advent of the automobile. As early as 1898 New Jersey prohibited the "driving of any horse, mule or other beast of burden while under the influence of intoxicating liquor." See N.J.S.A. 2A:170-13, repealed in 1971.
The first legislative enactment prohibiting drunken driving of a vehicle appeared in 1921 (L. 1921 c. 208, § 4). From the date of its enactment until 1966, when the Legislature added the new offense of operating a vehicle while one's ability is impaired, the statute remained essentially unchanged. There were intermittent changes, but these dealt with suspension periods and the addition of influencing substances such as narcotic, habit-forming or hallucinogenic drugs.
During this period of time several scientific methods of measuring blood alcohol levels were developed. These instruments were used as an aid in the investigation and prosecution of violations of the drunken driving statute. They were developed to the point where in 1951 the Legislature provided that any person who operated a motor vehicle with a blood alcohol level of .15% was presumed to be operating a vehicle while "under the influence" of intoxicating liquor. See N.J.S.A. 39:4-50.1 The reliability and conclusiveness *510 of this finding was judically approved in State v. Johnson, supra, 42 N.J. 146.
Justice Hall, speaking for a unanimous court, said:
The stated presumption, that if at least 0.15 per cent of alcohol is present in the blood the subject is under the influence of intoxicating liquor for the purposes of operation of a motor vehicle, recognizes the universally accepted truth that such is physiologically the case with respect to every person, regardless of the extent of usual external manifestations, individual tolerance for alcohol or pre-existing individual physical conditions or idiosyncracies. [at 169]
Continued scientific studies and observations revealed that not only was the driver with a .15% blood alcohol level under the influence, but individuals who had a blood alcohol concentration of .10% were presumptively under the influence. Public Hearing on Assembly Bill No. 46, April 10, 1963 at 16-17. These studies, consisting of both laboratory and driving experiments, concluded that while an individual's tolerance for alcohol and its effect is a factor in cases involving between .05% and .10% of blood alcohol concentration, at .10% all individuals were impaired or under the influence. Public Hearing, supra, at 52-53, 57-58.
An examination of all hearings held before the Senate and General Assembly clearly demonstrates that all of the foregoing conclusions are based on the scientific measurement of blood-alcohol concentration.
In order for law enforcement officials to have input from scientific testing of persons suspected of driving while under the influence, it was urged that the Legislature adopt the "implied consent law." By virtue of this law every person operating a motor vehicle over a New Jersey highway was declared to consent impliedly to submit to a breath test or suffer a sanction for his wrongful refusal. This recommendation was adopted and is embodied in N.J.S.A. 39:4-50.2.
The purpose of the sanction portion of the statute was to persuade every driver to submit to the test to eliminate any guesswork in determining the degree of intoxication. See *511 Public Hearings on Senate Bills, No. 8 & 9, vol. II at 18a (1966). One witness at the hearings testified that while an examining physician could find it easy to conclude that a particular driver was impaired, that there existed 100 pathological conditions which could cause the same impairment as that caused by alcohol. Public Hearing on Assembly Bill No. 46, at 64. This was advanced as an essential reason for the adoption of the implied consent law.
Drunkenness has not been uncommon among civilized people. It is recognizable and has common symptoms. While there are degrees or states of inebriation, it is conduct discernible by lay persons as well as medical experts. Children as well as adults can detect its presence. "Impairment" caused by alcohol is somewhat different. It is not conduct so readily apparent or identifiable. It is not conduct based upon common human experience, but rather a conclusion reached by scientific monitoring under clinical conditions. See Public Hearing on Assembly Bill No. 46, at 55-56. The presence or absence of "impairment" is far more elusive than that of drunkenness. Notwithstanding the inherent difficulty in determining its presence, the Legislature has specially provided that a test is not necessary to support a prosecution or conviction of operating a motor vehicle while impaired. N.J.S.A. 39:4-50.1 and 50.6.
Such a statutory scheme leaves the court to its own devices in determining what is "impaired" in the absence of the breath test. See State v. Cannon, 94 N.J. Super. 66, 69 (Cty. Ct. 1967), overruled on other grounds in State v. Sturn, 119 N.J. Super. 80 (App. Div. 1972). This is not an occasional problem. It is one which confronts the court in growing numbers. Statistics maintained by the Chemical Breath Testing Unit of the New Jersey State Police bear witness to this conclusion. Since 1967 this unit has maintaoined statistics accumulated by the State Police. At least 20%, or one out of every five drivers, requested to submit to a breath test have refused. During 1967 refusals totaled *512 259, or 23%. During the year ending June 1973, while the percentage remained basically the same, i.e., 21%, the number of refusals increased to 1,243. See Appendix A. Statistics based on the experience of all law enforcement agencies were not available. However, it is fair to assume that the rate of refusals is not greater or lesser with the State Police than it is with all municipal police departments. There are, therefore, a large number of cases presented to the courts where no scientific testing results are available as an aid in determining whether or not a driver was operating a vehicle while "under the influence," while "impaired," or neither.
In March 1968 the State Police prepared a manual entitled New Jersey State Police Drinking Driving Enforcement Guide. This guide contains a chart prepared from a study conducted by Kurt M. Dubowski, Ph.D., of Des Moines, Iowa. See Appendix B. The study related objective symptoms or signs with blood level testing. This chart is of assistance in determining or evaluating levels of intoxication. It sets forth several categories helpful in determining an individual's state of intoxication. This court adopts this guide as one source of meaningful information.
Comparing defendant's conduct and physical appearance with the standards set forth on the chart, this court finds, in the absence of a breath test, that defendant was operating his vehicle while he was under the influence of intoxicating liquor.
The facts show that defendant's clothing was in disarray, he fumbled through his wallet in search of his registration and license, he had to lean on the patrol car for balance, and the odor of alcohol emanated from his breath, all of which are symptoms of "stage 4" conduct on the chart.
The court has considered defendant's contention that he suffered from the adverse physical effects of the motor vehicle accident and was excited because of the police officers' handling of the situation. In spite of evidence supporting defendant's contentions, the court is of the opinion that the *513 State has proved beyond a reasonable doubt that defendant was under the influence of intoxicating liquor as charged.
Accordingly, the Court finds the defendant guilty of N.J.S.A. 39:4-50(a). Defendant is to present himself to the Court for imposition of sentence forthwith.

*514 APPENDIX A

REFUSALS TO TAKE BREATH TESTS

Fiscal Yr. Reports
 Ending Received Refusals Percentage
 6-67[*] 1088 259 23%
 6-68[**] 1468 325 22%
 6-69 2181 498 22%
 6-70 2292 503 21%
 6-71 2924 643 22%
 6-72 5098 1061 20%
 6-73 5827 1243 21%

APPENDIX B
ALCOHOL  EFFECT ON DRIVER:
 Judgment is impaired.
 Self-confidence increases.
 Inhibitions and restraints are relaxed.
 Vision, particularly side vision, is diminished.
 Less able to give attention required for safe driving.

 [Alcohol
 Stages Blood Count] General Clinical Signs/Symptoms
1. Sobriety 0  .06% No apparent influence. Behavior
 nearly normal by ordinary observation.
 Slight changes detectable by
 special tests.
2. Euphoria .03  .12% Mild euphoria, sociability, talkativeness,
 increased self-confidence; decreased
 inhibitions. Diminution of
 attention, judgment and control. Loss
 of efficiency in finer performance tests.
3. Excitement .09  .25% Emotional instability; decreased inhibitions,
 loss of critical judgment.
 Impairment of memory and comprehension.
 Decreased sensitory response;
 increased reaction time. Some muscular
 in-coordination.
4. Confusion .18  .30% Disorientation, mental confusion; dizziness,
 Exaggerated emotional states
 (fear, anger, grief, etc.) Disturbance
 of sensation (diplopia, etc.) and of

*515
 perception of color, form motion dimensions.
 Decreased pain sense. Impaired
 balance; muscular incoordination;
 staggering gait, slurred speech.
5. Stupor .27  .40% Apathy; general inertia, approaching
 paralysis. Markedly decreased response
 to stimuli. Marked muscular
 incoordination; inability to stand or
 walk. Vomiting; incontinence of
 urine and feces. Impaired consciousness;
 sleep or stupor.
6. Coma .35  .50% Complete unconsciousness; coma, anesthesia.
 Depressed or abolished reflexes,
 subnormal temperature. Incontinence
 of urine and feces, embarrassment
 of circulation and respiration.
 Possible death.
7. Death .45+ Death from respiratory paralysis.
 Source: Kurt M. Dubowski, Ph.D., Des Moines, Iowa

NOTES
[1] The certificates take the following form:

STATE OF NEW JERSEY
Department of Law and Public Safety
Division of State Police
Inspection Certificate
Instrument ____ Number ____ has been inspected and found to be in good operating order on ____
 Inspector ____________________
 NJState Police 343 (Rev. 1-67)

[*] "Drunkometer" still in use.
[**] "Breathalyzer" in use from this date forward.