**UNITED STATES of America**

v.

**Richard Woodward CHANNEL.**

**Crim. No. K–76–0279.**

United States District Court,
D. Maryland.

Sept. 30, 1976.

Jervis S. Finney, U. S. Atty., Marsha A. Ostrer, Asst. U. S. Atty., Baltimore, Md., assisted by Howard Schulman, law student at the University of Baltimore, for the United States.

Charles G. Bernstein, Federal Public Defender, Michael Schatzow, Asst. Federal Public Defender, Baltimore, Md., for defendant.

FRANK A. KAUFMAN, District Judge.

In this appeal taken from a judgment of conviction by a United States Magistrate, the scope and standard of review are the same as those in an appeal to a Circuit Court of Appeals from a District Court. Rule 8(d), Federal Rules for the Trial of Minor Offenses before United States Magistrates. In this case, Channel was charged with several offenses in violation of Md.Ann.Code art. 66½ (1970 Repl. Vol.), as amended (1975 Cum.Supp.), involving operation of a motor vehicle on a United States military reservation. Pursuant to 18 U.S.C. §§ 7(3), 13, Maryland law is appli-

cable. *See United States v. Sharpnack*, 355 U.S. 286, 78 S.Ct. 291, 2 L.Ed.2d 282 (1958). *See also United States v. Bales*, 538 F.2d 325 (4th Cir. 1976). Specifically, Channel was charged with (1) failure to stop after an accident, Md.Ann.Code art. 66½, § 10–103; (2) driving while intoxicated, Md.Ann. Code art. 66½, § 11–902(a); and (3) failure to slow to avoid a collision, Md.Ann.Code art. 66½, § 11–801(a). At trial before the Magistrate, Channel, as he is in this Court, was represented by an assistant federal public defender. After the Government rested its case, the Magistrate granted defendant's motions for acquittal as to the charges dealing with failure to slow and with failure to stop, leaving outstanding only the charge of driving while intoxicated. On that remaining charge the Magistrate convicted defendant and sentenced him to ten months' confinement. From that judgment of conviction defendant appeals.

At trial, a passenger in a Chevrolet van which was involved in an accident in the early A.M. hours of January 17, 1976 with a Ford automobile in which Channel was riding, testified that before the accident, the Chevrolet van passed the Ford car and the latter was zigzagging on the road; that thereafter when the van stopped at an intersection, the Ford struck the van in the rear and later left the scene of the accident; and that before the Ford departed from that scene, he observed Channel standing by an open door on the driver's side of the Ford.[1] Further, that witness testified that the van thereupon followed the Ford and that the latter again was zigzagging. Another passenger in the van also testified, generally corroborating the first said witness' testimony. That second witness indicated that, after the accident, the Ford zigzagged to the extent of crossing the center line by two or three feet every five seconds.

Officer Prchaska of the Maryland State Police testified that later that same morn-ing after the occupants of the van reported those events, he was dispatched to find the Ford and found it parked with its motor running in a driveway leading to a state warehouse with Channel sitting in its driver's seat. Prchaska stated that when he arrested Channel a short time thereafter there was a very strong odor of alcohol about Channel's person and Channel's eyes appeared glassy and blood shot and his speech was slurred. Prchaska further testified that he had to help Channel into the police car and up the steps of the police barracks.

Sergeant Howard Franklin of the military police testified that Channel, still later during that same morning, walked "in a heavy staggering gait" and that Franklin could smell alcohol approximately six feet from the defendant. Franklin also stated that Channel's eyes were blood shot and heavy and his speech was slurred.

■ Channel's wife, son and stepdaughter were called as witnesses by the defendant. Their testimony indicated that the defendant had been drinking earlier in the evening at a bowling alley; that the defendant's car would not start when the family left the bowling alley; and that the defendant remained with the car. They also testified that when the defendant subsequently failed to turn up at home, they returned to search for him and found him asleep in his car and could not awaken him. The son and the stepdaughter further testified that they smelled beer about Channel's person. Additionally, they testified that Channel's minor stepdaughter, who did not possess a driver's license, undertook to drive her father home and was the operator of the vehicle at the time of, and after, the accident. The stepdaughter stated that Channel remained asleep until the force of the accident threw him to the floor of the car. The Magistrate found that Channel himself operated the motor vehicle. A review of the record discloses more than suf-

---

1. The driver of the van who, along with the passengers in the van, was at the time on active military duty and who, according to those passengers, spoke to the driver of the Ford, was out of the area at the time of trial and did not testify.

ficient evidence for the Magistrate so to have found beyond a reasonable doubt.[2]

Channel argues that even if the evidence was sufficient to establish beyond a reasonable doubt that Channel was driving while his ability was impaired by the use of alcohol, the evidence was insufficient to support the finding beyond a reasonable doubt of driving while intoxicated. Md.Ann.Code art. 66½, § 11–902 provides:

(a) It shall be unlawful for any person to drive or attempt to drive or to be in actual physical control of any vehicle within this State while he is in an intoxicated condition.

(b) It shall be unlawful for any person to drive or attempt to drive or to be in actual physical control of any vehicle within this State while his driving ability is impaired by the consumption of alcohol.

\* \* \* \* \* \*

Md.Ann.Code art. 66½, § 17–101 provides:

(i) Every person who is convicted of a violation of \* \* \* subsection (a) of § 11–902 shall be punished by imprisonment for not more than one year or by fine of not more than $1,000 or both fine and imprisonment.

On a second or subsequent conviction he may be punished by imprisonment for not more than two years, and in the discretion of the court, a fine of not more than $1,000.

(ii) Every person who is convicted of a violation of \* \* \* § 11–902(b) of this article shall be punished by a fine of not more than $500 or by imprisonment for not more than 2 months or by both fine and imprisonment.

(iii) Every person who is convicted of a second or subsequent violation of \* \* subsection (b) of § 11–902 may be punished by imprisonment for not more than one year, and in the discretion of the court, a fine of not more than $500.

Defendant contends that the statutory term "intoxicated" has never been adequately defined by the Maryland legislature or courts and that therefore section 11–902(a) is unconstitutionally vague. In support of that contention, Channel refers to Md.Ann.Code, Cts. & Jud.Proc. Art., § 10–307—Chemical Test for Intoxication—Results of analysis and presumptions. That section provides:

(a) *In general.*—In a proceeding in which a person is charged with driving or attempting to drive a vehicle in violation of § 11–902 of Article 66½ of the Code, the amount of alcohol in the person's breath, blood, or urine shown in chemical analysis as provided in this subtitle is admissible in evidence and has the effect set forth in subsection (b) through (e).

(b) *No intoxication presumed.*—If there was in his blood at the time of testing 0.05 percent or less, by weight, of alcohol, as determined by an analysis of his blood or breath, or if there was in his urine 0.08 percent or less, by weight, of alcohol, it shall be presumed that the defendant was not in an intoxicated condition, that his driving ability was not impaired by the consumption of alcohol, and that he was not under the influence of intoxicating liquor.

(c) *No presumption.*—If there was in his blood at the time of testing more than 0.05 percent, but less than 0.10 percent, by weight, of alcohol, as determined by an analysis of his blood or breath, or if there was in his urine more than 0.08 percent, but less than 0.13 percent, by weight, of alcohol, this fact may not give rise to any presumption that the defendant was or was not in an intoxicated condition or was or was not under the influence of intoxicating liquor, or that his driving ability was or was not impaired by the consumption of alcohol, but this fact may be considered with other

---

**2.** There was testimony from one or more of the persons in the van that the defendant's daughter was seen riding on the passenger side of the car and that the defendant was in the driver's seat before the accident, at the scene of the accident and while the car was leaving that scene. Officer Prchaska also testified that when he found the car the defendant was in the driver's seat.

competent evidence in determining the guilt or innocence of the defendant.

(d) *Prima facie evidence of impairment.* —If there was in his blood at the time of testing 0.10 percent, or more, by weight, of alcohol, as determined by an analysis of his blood or breath, or if there was in his urine 0.13 percent, or more, by weight, of alcohol, it shall be prima facie evidence that the defendant's driving ability was impaired by the consumption of alcohol.

(e) *Prima facie evidence of intoxication.*—If there was in his blood at the time of testing 0.15 percent, or more, by weight, of alcohol, as determined by an analysis of his blood or breath, or if there was in his urine, 0.20 percent, or more, by weight, of alcohol, it shall be prima facie evidence that the defendant was in an intoxicated condition.

■ Under Maryland law it is not necessary that intoxication be proven by scientific test or expert testimony. Judge Orth, then Chief Judge of the Court of Special Appeals, recently upheld convictions under both subsections of section 11–902, writing as follows:

[T]he introduction of evidence with respect to the alcoholic content in the accused's body, as shown upon chemical analysis through tests pursuant to Courts Art. §§ 10–302 through 10–309, is not a prerequisite to a conviction of the crimes proscribed by Art. 66½, § 11–902(a) and (b). Conviction may be had on any competent evidence legally sufficient to establish the *corpus delicti* of the crimes and the criminal agency of the accused.

*Major v. State,* 31 Md.App. 590, 358 A.2d 609, 613 (1976).

In this case, no test was ever performed to determine the level of alcohol in Channel's blood or urine, nor did any witness, expert or other, testify as to the level of alcohol to be inferred from Channel's behavior. Without such evidence, Channel argues, it is not permissible for the state of being "intoxicated", as distinguished from the state of being "impaired", to be determined. Put another way, Channel's argument rests on the proposition that the standard is so vague as to be unconstitutional.[3]

Defendant's vagueness argument may not prevail in this case in which the testimony given by witnesses called by both sides demonstrated that defendant was intoxicated. That is true even though support for Channel's vagueness contention is to be found in *People v. Jones,* 77 Misc.2d 33, 352 N.Y.S.2d 771 (Town Court of Tonawanda, N.Y., 1974), in which the defendant therein, charged with driving while intoxicated, was convicted only of the lesser offense of driving while his ability was impaired, seemingly, at least in part, because the Court found the two standards too imprecise to permit a distinction between them. *But see People v. Weber,* 82 Misc.2d 593, 371 N.Y.S.2d 361 (Justice Court of Town of Elma, Erie County, N.Y., 1975).

In *United States v. Mazurie,* 419 U.S. 544, 95 S.Ct. 710, 42 L.Ed.2d 706 (1975), the Supreme Court upheld as not unconstitutionally vague a federal criminal statute, 18 U.S.C. § 1154, which proscribes the unauthorized introduction of alcoholic beverages into Indian country. In *Mazurie,* defendants, who had ceased the operation of a state licensed bar on privately owned land within the boundaries of a Wyoming Indian reservation after their application to the local tribal authorities for a tribal license

---

**3.** It would appear that Channel may also be contending that at worst the evidence only permitted his conviction for driving while his ability was impaired. Md.Ann.Code art. 66½, § 16–104 provides:

*Lesser included offenses under §§ 11–901 and 11–902.*

It shall be sufficient to charge any person with a violation of § 11–901 (reckless and negligent driving) and § 11–902 (driving while intoxicated, impaired or under the in-

fluence of drugs) and the court is empowered to make a finding under any subsection of either § 11–901 or § 11–902.

*See Thompson v. State,* 26 Md.App. 442, 338 A.2d 411 (1975) discussing that section. Whether defendant could have been found guilty by the Magistrate of driving while "impaired" is an issue this Court need not reach herein in view of its determination concerning the charge of "intoxicated".

had been denied, began again to operate that bar despite the said denial. Defendants, who were not Indians, operated that bar on the outskirts of a small, unincorporated village. The primary issue at trial was whether the bar was within "Indian country" as those two words are defined by 18 U.S.C. § 1151, subject to the exception set forth in 18 U.S.C. § 1154(c) for "fee-patented land in non-Indian communities". The District Court found as a fact that the bar was within Indian country. The Tenth Circuit reversed and in turn was reversed by the Supreme Court which ordered the convictions reinstated. Writing for a unanimous Court, Mr. Justice Rehnquist held (at 550–53, 95 S.Ct. at 714):

It is well established that vagueness challenges to statutes which do not involve First Amendment freedoms must be examined in the light of the facts of the case at hand. *United States v. National Dairy Products Corp.,* 372 U.S. 29, 83 S.Ct. 594, 9 L.Ed.2d 561 (1963). In determining whether § 1154(c) is unconstitutionally vague as to respondents, we must therefore first consider the evidence as to the location of The Blue Bull.[9]

[9] We assume, arguendo, as has the Government in its arguments before this court, that the prosecution has the burden of proving that the § 1154(c) statutory exceptions are not applicable. Because of this assumption, and because we conclude that the Government in any event did carry this burden, we need not consider whether the exception must be pleaded and proved by criminal defendants. Cf. *United States v. Vuitch,* 402 U.S. 62, 70, 91 S.Ct. 1294, 1298, 28 L.Ed.2d 601 (1971) (dealing with a criminal statute in which "an exception is incorporated in the *enacting clause* of a statute"). (Emphasis supplied.)

The evidence showed that the bar was located on the outskirts of Fort Washakie, Wyo., an unincorporated village bearing the name of the man who was Chief of the Shoshones during their early years on the Wind River Reservation. *Shoshone Tribe v. United States,* 299 U.S. 476 at 486, 57 S.Ct. 244, 81 L.Ed. 360; Harmston, supra, n. 2, at 3–4. Fort Washakie is the location of the Wind River Agency of the Bureau of Indian Affairs, and of the Tribal Headquarters of the Wind River Tribes. One witness testified that the village was an "Indian community." App., at 49. The evidence also showed that of the 212 families living within a 20-square-mile area roughly centered on The Blue Bull, 170 were Indian families, 41 were non-Indians, and one was mixed. A large-scale United States Geological Survey map was introduced to show the limits of this housing survey. It indicates that the survey included all settlements within the Fort Washakie area, and that the nearest not-included concentrations of housing were at Saint James Church and Ethete, some four miles beyond the boundaries of the survey and some six miles from Fort Washakie. The evidence also established that the state school serving Fort Washakie, and located about two and one-half miles from The Blue Bull, had a total enrollment of 243 students, 223 of whom were Indian.

Other evidence bearing on whether The Blue Bull was located in a non-Indian community was Martin Mazurie's testimony that the bar served both Indians and non-Indians, and that, "We are kind of out there by ourselves, you know." App., at 70. A transcript of the hearing on the Mazuries' application to the tribes for a retail liquor license was also admitted at the trial. That transcript indicates that The Blue Bull was located near a public housing development populated largely if not entirely by Indians. Residents of this development complained that persons leaving the bar late at night, and for one reason or another having either no transportation or no destination, would wander into the development.

There was no testimony that The Blue Bull was in a non-Indian community. The defense did obtain acknowledgments by prosecution witnesses that they could not precisely state the boundaries of the Fort Washakie *Indian* community. Otherwise, examination by the defense was directed at establishing that the term "Indian" was without precise meaning, and that the State of Wyoming generally had jurisdiction over non-Indians and their lands within the reservation.

We think that the foregoing evidence was sufficient to justify the District Court's implied conclusion that Fort Washakie and its surrounding settlements did not comprise a non-Indian community. We do not read the opinion of the Court of Appeals as reaching a conclusion contrary to that we have just stated. That Court instead based its decision on the proposition that such proof did not go far enough, a view generated by its opinion of the requirements this statute must meet in order to avoid the vice of vagueness. The Court of Appeals was looking for proof beyond a reasonable doubt of precisely defined concepts of "Indian" and "community." We gather that it expected persons treated as "Indians" in the housing and school surveys to be proved to satisfy a specific statutory definition. Similarly, it apparently expected that proof concerning the "community" should have conformed to some specific statutory definition, presumably one keyed to a geographical area with precise boundaries.

We believe that the Court of Appeals erred by holding that the Constitution requires proof of such precisely defined concepts. The prosecution was required to do no more than prove that The Blue Bull was not located in a non-Indian community, where that term has a meaning sufficiently precise for a man of average intelligence to "reasonably understand that his contemplated conduct is proscribed." *United States v. National Dairy Products Corp.,* 372 U.S. at 32–33, 83 S.Ct. 594, 9 L.Ed.2d 561. Given the nature of The Blue Bull's location and surrounding population, the statute was sufficient to advise the Mazuries that their bar was not excepted from tribal regulation by virtue of being located in a non-Indian community.[10]

[10] We note that the § 1154(c) exception is available for fee-patented lands which are in *non-Indian* communities, rather than for those which *are not* in *Indian* communities. This fact renders irrelevant the inability of prosecu-

tion witnesses to specify precise boundaries of the Fort Washakie *Indian* community.

We need not detain ourselves with an issue which seemed to cause the Court of Appeals some difficulties, that of what qualifies a person as an "Indian." The record plainly establishes that, in the circumstances of this case, the distinction between Indians and non-Indians was generally understood. Those who testified about the housing and school surveys displayed no difficulty in making such classifications. Nor did Mr. Mazurie. He testified that when there was trouble at his bar he would call the county sheriff to deal with a non-Indian, but would call the tribal police to deal with an Indian. When his counsel questioned him as to how he determined which was which, he simply replied: "Because I knew them." App. 70.

In *United States v. Powell,* 423 U.S. 87, 96 S.Ct. 317, 46 L.Ed.2d 228 (1975), the Court upheld as constitutional 18 U.S.C. § 1715 (1970) which prohibits mailing "[p]istols, revolvers, and *other firearms capable of being concealed on the person*" (emphasis supplied). In *Powell,* defendant's conviction for mailing a sawed-off shotgun, 22⅛ inches in length, was reversed by the Ninth Circuit on the grounds that the statutory language emphasized above was so vague as to violate due process. Disagreeing, a majority of the Supreme Court,[4] through Mr. Justice Rehnquist, stated (423 U.S. at 92–93, 96 S.Ct. at 319–320, 46 L.Ed.2d at 233–35):

We said last Term that "[i]t is well established that vagueness challenges to statutes which do not involve First Amendment freedoms must be examined in the light of the facts of the case at hand." *United States v. Mazurie,* 419 U.S. 544, 550, 95 S.Ct. 710, 42 L.Ed.2d 706 (1975). The Court of Appeals dealt with the statute generally, rather than as applied to respondent in this case. It must necessarily have concluded, therefore, that the prohibition against mailing a "firearm[s] capable of being concealed on the person" proscribed no comprehensible course of conduct at all. It is well settled, of course, that such a statute may not constitutionally be applied to any set

**4.** Mr. Justice Stewart in sole dissent disagreed with the majority with regard to a matter of statutory construction.

of facts. *Lanzetta v. New Jersey,* 306
U.S. 451, 59 S.Ct. 618, 83 L.Ed. 888 (1939);
*Connally v. General Construction Co.,* 269
U.S. 385, 391, 46 S.Ct. 126, 70 L.Ed. 322
(1926).

An example of such a vague statute is
found in *United States v. L. Cohen Grocery Co.,* 255 U.S. 81, 89, 41 S.Ct. 298, 65
L.Ed. 516 (1921). The statute there prohibited any person from "willfully
mak[ing] any unjust or unreasonable rate
or charge in . . . dealing in or with
any necessaries. . . ." So worded it
"forbids no specific or definite act" and
"leaves open . . . the widest conceivable inquiry, the scope of which no
one can foresee and the result of which
no one can foreshadow or adequately
guard against." *Ibid.*

On the other hand, a statute which
provides that certain oversized or heavy
loads must be transported by the "shortest practicable route" is not unconstitutionally vague. *Sproles v. Binford,* 286
U.S. 374, 393, 52 S.Ct. 581, 76 L.Ed. 1167
(1932). The carrier has been given clear
notice that a reasonably ascertainable
standard of conduct is mandated; it is for
him to insure that his actions do not fall
outside the legal limits. The sugar dealer

in *Cohen,* to the contrary, could have no
idea in advance what an "unreasonable
rate" would be because that would be
determined by the vagaries of supply and
demand, factors over which he had no
control. Engaged in a lawful business
which Congress had in no way sought to
proscribe, he could not charge *any* price
with the confidence that it would not be
later found unreasonable.

But the challenged language of 18
U.S.C. § 1715 is quite different from that
of the statute involved in *Cohen.* It intelligibly forbids a definite course of conduct: the mailing of concealable firearms. While doubts as to the applicability of the language in marginal fact situations may be conceived, we think that the
statute gave respondent adequate warning that her mailing of a sawed-off shotgun of some 22 inches in length was a
criminal offense. Even as to more doubtful cases than that of respondent, we
have said that "the law is full of instances where a man's fate depends on his
estimating rightly, that is, as the jury
subsequently estimates it, some matter of
degree." *Nash v. United States,* 229 U.S.
373, 377, 33 S.Ct. 780, 57 L.Ed. 1232
(1913).[5]

---

**5.** In *Nash,* Mr. Justice Holmes was dealing with
Sherman Act standards in a criminal case.

A different situation obtains where no standard whatsoever is provided. In *Giaccio v.
Pennsylvania,* 382 U.S. 399, 86 S.Ct. 518, 15
L.Ed.2d 447 (1966), the Pennsylvania statute
under attack was described by Mr. Justice
Black (at 400–01, 86 S.Ct. at 519) as providing
that " * * * in all cases of acquittals by the
petit jury on indictments for [offenses other
than felonies], the jury trying the same shall
determine, by their verdict, whether the county, or the prosecutor, or the defendant shall pay
the costs * * * and whenever the jury shall
determine as aforesaid, that the * * * defendant shall pay the costs, the court in which
the said determination shall be made shall
forthwith pass sentence to that effect, and order him to be committed to the jail of the
county until the costs are paid, unless he give
security to pay the same within ten days." Mr.
Justice Black, holding the statute unconstitutional, wrote (at 402–03, 86 S.Ct. at 520–21):
 [A] law fails to meet the requirements of the
 Due Process Clause if it is so vague and
 standardless that it leaves the public uncertain as to the conduct it prohibits or leaves

judges and jurors free to decide, without any
legally fixed standards, what is prohibited
and what is not in each particular case. * *
This * * * [law] *contains no standards at
all,* nor does it place any conditions of any
kind upon the jury's power to impose costs
upon a defendant who has been found by the
jury to be not guilty of a crime charged
against him. The Act, without imposing a
single condition, limitation or contingency on
a jury which has acquitted a defendant simply says the jurors "shall determine, by their
verdict, whether . . . the defendant,
shall pay the costs" whereupon the trial
judge is told the "shall forthwith pass sentence to that effect, and order him [defendant] to be committed to the jail of the county" there to remain until he either pays or
gives security for the costs. Certainly one of
the basic purposes of the Due Process Clause
has always been to protect a person against
having the Government impose burdens upon
him except in accordance with the valid laws
of the land. Implicit in this constitutional
safeguard is the premise that the law must be
one that carries an understandable meaning

The Court of Appeals questioned whether the "person" referred to in the statute to measure capability of concealment was to be "the person mailing the firearm, the person receiving the firearm, or, perhaps, an average person, male or female, wearing whatever garb might be reasonably appropriate, wherever the place and whatever the season?" 501 F.2d, 1183 at 1137. But we think it fair to attribute to Congress the commonsense meaning that such a person would be an average person garbed in a manner to aid, rather than hinder, concealment of the weapons. Such straining to inject doubt as to the meaning of words where no doubt would be felt by the normal reader is not required by the "void for vagueness" doctrine, and we will not indulge in it.

The Court of Appeals also observed that "to require Congress to delimit the size of the firearms (other than pistols and revolvers) it intends to declare unmailable is certainly to impose no insurmountable burdens upon it . . .." *Ibid.* Had Congress chosen to delimit the size of the firearms intended to be declared unmailable, it would have written a different statute, and in some respects a narrower one than it actually wrote. To the extent that it was intended to proscribe the mailing of *all* weapons capable of being concealed on the person, a statute so limited would have been less inclusive than the one Congress actually wrote.

But the more important disagreement we have with this observation of the Court of Appeals is that it seriously misconceives the "void for vagueness" doctrine. The fact that Congress might, without difficulty, have chosen "clearer and more precise language" equally capable of achieving the end which it sought does not mean that the statute which it in fact drafted is unconstitutionally

with legal standards that courts must enforce. This state Act as written does not even begin to meet this constitutional requirement. [Emphasis supplied.]

vague. *United States v. Petrillo,* 332 U.S. 1, 7, 67 S.Ct. 1538, 91 L.Ed. 1877 (1947).

■ Criminal statutes are not *per se* unconstitutional because they possess some area of "open texture"[6] in which reasonable minds may differ as to particular applications. It is enough if "the commonsense meaning"[7] is clear.

In *United States v. Campos-Serrano,* 404 U.S. 293, 298, 92 S.Ct. 471, 474, 30 L.Ed.2d 457 (1971), quoting in part from *United States v. Bramblett,* 348 U.S. 503, 510, 75 S.Ct. 504, 99 L.Ed. 594 (1955), Mr. Justice Stewart wrote:

> The canon of strict construction of criminal statutes, of course, "does not mean that every criminal statute must be given the narrowest possible meaning in complete disregard of the purpose of the legislature." * * *

And in *United States v. Cook,* 384 U.S. 257, 262–63, 86 S.Ct. 1412, 1415, 16 L.Ed.2d 516 (1966), Mr. Justice White stated:

> We are mindful of the maxim that penal statutes should be strictly construed. But that canon "is not an inexorable command to override common sense and evident statutory purpose," * * * and does not "require that the act be given the 'narrowest meaning.' It is sufficient if the words are given their fair meaning in accord with the evident intent of Congress." * * * [Citations omitted.]

Judge Field, relying upon *Cook,* observed in *United States v. Williams,* 485 F.2d 1383, 1384 (4th Cir. 1973):

> While it is true that criminal statutes are to be strictly construed and that ambiguities are to be resolved in favor of the defendant, statutes are not to be construed in a manner which would defeat their clear purpose. *United States v. Cook,* 384 U.S. 257, 262, 86 S.Ct. 1412, 16 L.Ed.2d 516 (1966).

**6.** H.L.A. Hart, Concept of Law 124 (1961).

**7.** *United States v. Powell,* 423 U.S. at 93, 96 S.Ct. at 320, 46 L.Ed.2d at 234.

█  Applying the above set forth principles in the instant case, there is no constitutional infirmity.  While it is seemingly true that the standard "intoxicated" is capable of more precise definition,[8] the failure of the Maryland legislature and courts so to define the term is not a denial of due process in this case in which the evidence discloses beyond a reasonable doubt that defendant was highly intoxicated, according to the generally accepted meaning of those words.  It is also irrelevant that in a hypothetical case a different defendant might be on the hazy line between intoxicated and impaired.  Whether a defendant in such a case would have a meritorious defense based on constitutional or other reasons need not be determined herein.

The judgment of the Magistrate is affirmed.

---

8.  For example, the Virginia General Assembly has, in Code of Va. § 4–2(14) (1976 Cum. Supp.), provided the following definition:

"*Intoxicated*" Any person who has drunk enough alcoholic beverages to so affect his manner, disposition, speech, muscular movement, general appearance or behavior, as to be apparent to observation, shall be deemed to be intoxicated.

For a discussion of Virginia law, *see United States v. Fletcher,* 344 F.Supp. 332 (E.D.Va. 1972); *United States v. Gholson,* 319 F.Supp. 499, 503 (E.D.Va.1970); and cases therein discussed and cited.  As to New Jersey law, *see State v. Conners,* 126 N.J.Super. 500, 311 A.2d 764 (1973).