# UNITED STATES *v.* MAZURIE ET AL.

No. 73–1018.   Argued November 12, 1974—Decided January 21, 1975

REHNQUIST, J., delivered the opinion for a unanimous Court.

*Harry R. Sachse* argued the cause for the United States. With him on the brief were *Solicitor General Bork, Assistant Attorney General Johnson, Jacques B. Gelin,* and *Lawrence E. Shearer.*

*Charles E. Hamilton* argued the cause and filed a brief for respondents.

*Jerome F. Statkus,* Assistant Attorney General, argued the cause for the State of Wyoming as *amicus curiae* urging affirmance. With him on the brief was *Sterling A. Case,* Deputy Attorney General.*

MR. JUSTICE REHNQUIST delivered the opinion of the Court.

The respondents were convicted of introducing spirituous beverages into Indian country, in violation of 18 U. S. C. § 1154.[1] The Court of Appeals for the Tenth

---

*Marvin J. Sonosky* and *Glen A. Wilkinson* filed a brief for the Shoshone and Arapahoe Tribes of the Wind River Indian Reservation as *amici curiae* urging reversal.

[1] Title 18 U. S. C. § 1154 provides in pertinent part:

"(a) [W]hoever introduces or attempts to introduce any malt, spirituous, or vinous liquor, including beer, ale, and wine, or any ardent or intoxicating liquor of any kind whatsoever into the Indian country, shall, for the first offense, be fined not more than $500 or imprisoned not more than one year, or both; and, for each sub-

Circuit reversed. 487 F. 2d 14 (1973). We granted certiorari, 415 U. S. 947 (1974), in order to consider the Solicitor General's contentions that 18 U. S. C. § 1154 is not unconstitutionally vague, that Congress has the constitutional authority to control the sale of alcoholic beverages by non-Indians on fee-patented land within the boundaries of an Indian reservation, and that Congress could validly make a delegation of this authority to a reservation's tribal council. We reverse the Court of Appeals.

I

The Wind River Reservation was established by treaty in 1868. Located in a rather arid portion of central Wyoming, at least some of its 2,300,000 acres have been described by Mr. Justice Cardozo as "fair and fertile," *Shoshone Tribe* v. *United States,* 299 U. S. 476, 486 (1937). It straddles the Wind River, with its remarkable canyon, and lies in a mile-high basin at the foot of the Wind River Mountains, whose rugged, glaciated peaks and ridges form a portion of the Continental Divide.[2] The reservation is occupied by the Shoshone and Arapahoe Tribes. Although these tribes were once "ancestral foes," *ibid.,* they are today jointly known as the Wind River Tribes. As a result of various patents, substantial tracts of non-Indian-held land are scattered within the reservation's boundaries.

---

sequent offense, be fined not more than $2,000 or imprisoned not more than five years, or both.

. . . . .

"(c) The term 'Indian country' as used in this section does not include fee-patented lands in non-Indian communities or rights-of-way through Indian reservations, and this section does not apply to such lands or rights-of-way in the absence of a treaty or statute extending the Indian liquor laws thereto."

[2] F. Harmston, Wind River Basin 2 (1953); H. Granger et al., Mineral Resources of the Glacier Primitive Area, Wyoming, Geological Survey Bull. No. 1319-F, pp. F2–F5 (1971).

It was on such non-Indian land that respondents Martin
and Margaret Mazurie operated their bar, which did busi-
ness under the corporate name of the Blue Bull, Inc.

Before 1953 federal law generally prohibited the in-
troduction of alcoholic beverages into "Indian country."
18 U. S. C. § 1154 (a). "Indian country" was defined
by 18 U. S. C. § 1151 to include non-Indian-held lands
"within the limits of any Indian reservation." [3]  In 1949,
the term was given a narrower meaning, insofar as rele-
vant to the liquor prohibition, so as to exclude both
fee-patented lands within "non-Indian communities" and
rights-of-way through reservations. Act of May 24,
1949, 63 Stat. 94, 18 U. S. C. § 1154 (c), *supra*, n. 1.
The quoted term is not defined, a fact which creates prob-
lems with which we shall shortly deal. In 1953 Congress
passed local-option legislation allowing Indian tribes, with
the approval of the Secretary of the Interior, to regulate
the introduction of liquor into Indian country, so long as
state law was not violated. Act of Aug. 15, 1953, 67 Stat.
586, 18 U. S. C. § 1161.[4] The Wind River Tribes responded
to this option by adopting an ordinance which permitted

---

[3] Title 18 U. S. C. § 1151 provides in pertinent part:
"Except as otherwise provided in sections 1154 and 1156 of this
title, the term 'Indian country,' as used in this chapter, means
(a) all land within the limits of any Indian reservation under the
jurisdiction of the United States Government, notwithstanding the
issuance of any patent, and, including rights-of-way running through
the reservation . . . ."

[4] Title 18 U. S. C. § 1161 provides:
"The provisions of sections 1154, 1156, 3113, 3488, and 3618, of
this title, shall not apply within any area that is not Indian country,
nor to any act or transaction within any area of Indian country
provided such act or transaction is in conformity both with the laws
of the State in which such act or transaction occurs and with an
ordinance duly adopted by the tribe having jurisdiction over such
area of Indian country, certified by the Secretary of the Interior,
and published in the Federal Register."

liquor sales on the reservation if made in accordance with Wyoming law. When the Blue Bull originally opened, a liquor license had been issued to it by Fremont County, Wyo., and its operation was therefore consistent with that tribal ordinance. But in 1971 the Wind River Tribes adopted a new liquor ordinance, Ordinance No. 26.[5] That ordinance required that retail liquor outlets within Indian country obtain both tribal and state licenses.

In 1972, the Mazuries applied for a tribal license, after warnings that they would be subject to criminal charges if they continued to operate without one. The tribes held a public hearing which Martin Mazurie and the Mazuries' lawyer attended. Witnesses protested grant of the license, complaining of singing and shooting at late hours, disturbances of elderly residents of a nearby housing development, and the permitting of Indian minors in the bar. The application was denied.

Thereafter, the Mazuries closed the Blue Bull. Three weeks later they reopened it. It remained in operation for approximately a year, until federal officers seized its alcoholic beverages, and this criminal prosecution was initiated.[6]

The case was tried to the District Court without a jury. Since most of the factual issues were disposed of by stipulations,[7] the testimony at trial primarily dealt with

---

[5] The ordinance was properly approved by the Secretary of the Interior and published in the Federal Register. 37 Fed. Reg. 1253–1254 (1972).

[6] The Blue Bull was reopened after the decision of the Court of Appeals. In April 1974, however, Fremont County refused to renew its license and it was again closed. Brief for United States 5 n. 4; Brief for Respondents 20 n. 8.

[7] It was stipulated that the Blue Bull was being operated without the license required by Ordinance No. 26, that alcoholic beverages had been sold at the Blue Bull, that the Blue Bull was located within the Wind River Reservation, but on land which it owned in

whether the bar was within "Indian country." On the basis of testimony about the Blue Bull's location, and about the racial composition of residents of the surrounding area, the court concluded that the bar was so located. Holding that federal authority could reach non-Indians located on privately held land within a reservation's boundaries, the court entered judgments of conviction. Each respondent was fined $100.

The Court of Appeals reversed the convictions. It concluded that the prosecution had not carried its burden of proving beyond a reasonable doubt that the bar was not excluded from Indian country by the § 1154 (c) exception for "fee-patented lands in non-Indian communities." [8] This conclusion was tied directly to the more basic holding:

> "[T]he terminology of 'non-Indian community' is not capable of sufficiently precise definition to serve as

fee, and that the Blue Bull had been properly licensed by state authorities.

[8] The District Court did not make a specific finding of fact that the Blue Bull was not located in a non-Indian community. The court did find that it was in "Indian Country," that it was situated "at a site known as Fort Washakie, Wyoming," that "Fort Washakie is not an incorporated non-Indian community with recognized boundaries," and that the bar had been operated in violation of 18 U. S. C. § 1154 (which contains the exclusion from "Indian country" of fee-patented lands in non-Indian communities). The ambiguity in the trial court's findings is readily explained by respondents' failure to focus on the issue at trial. The nature of defense testimony and cross-examination is discussed *infra*, at 552. That respondents failed to contest the issue is further established by the motion to dismiss at the close of the Government's evidence. The basis of the motion was failure "to prove beyond a doubt that [respondents] *are* operating in an *Indian* community," App. 64 (emphasis added), which even if true is plainly irrelevant under the wording of § 1154 (c). Respondents' counsel then proceeded with an argument based on respondents' unrestricted fee ownership of the property on which the bar was located. App. 64. In addition, respondents'

an element of the crime herein considered .... The statute is thus fatally defective by reason of this indefinite and vague terminology." 487 F. 2d, at 18.

As a second basis for reversal, the court held that insofar as 18 U. S. C. § 1161 authorized Indian tribes to adopt ordinances controlling the introduction by non-Indians of alcoholic beverages onto non-Indian land, it was an invalid congressional attempt to delegate authority. The Court of Appeals also suggested that Congress itself could not regulate the sale of alcohol by non-Indians on fee-patented non-Indian lands within Indian reservations.

## II

It is well established that vagueness challenges to statutes which do not involve First Amendment freedoms must be examined in the light of the facts of the case at hand. *United States* v. *National Dairy Products Corp.*, 372 U. S. 29 (1963). In determining whether § 1154 (c) is unconstitutionally vague as to respondents, we must therefore first consider the evidence as to the location of the Blue Bull.[9]

---

counsel did not dispute the court's statement at the close of the trial that the "sole issue" was "whether or not the Tribal Council has jurisdiction over deeded land held by these parties in fee . . . ." 2 Record on Appeal 140. The court went on to state:

"[I]t is in Indian Country. There is not any question. You do not need to cite a single case that this bar and this ten acres is [*sic*] located in Indian Country. I am not saying it is Indian land, but it is Indian Country." *Ibid.*

Again, respondents' counsel made no objection. He also apparently did not seek to focus the court's attention on the issue by filing either a post-trial brief or proposed findings of fact and conclusions of law; while both parties had the opportunity to make such submissions, only the prosecution's appears in the record on appeal.

[9] We assume, *arguendo,* as has the Government in its arguments before this court, that the prosecution has the burden of proving

The evidence showed that the bar was located on the outskirts of Fort Washakie, Wyo., an unincorporated village bearing the name of the man who was chief of the Shoshones during their early years on the Wind River Reservation. *Shoshone Tribe* v. *United States,* 299 U. S., at 486; Harmston, *supra,* n. 2, at 3–4. Fort Washakie is the location of the Wind River Agency of the Bureau of Indian Affairs, and of the Tribal Headquarters of the Wind River Tribes. One witness testified that the village was an "Indian community." App 49. The evidence also showed that of the 212 families living within a 20-square-mile area roughly centered on the Blue Bull, 170 were Indian families, 41 were non-Indians, and one was mixed. A large-scale United States Geological Survey map was introduced to show the limits of this housing survey. It indicates that the survey included all settlements within the Fort Washakie area, and that the nearest not-included concentrations of housing were at Saint James Church and Ethete, some four miles beyond the boundaries of the survey and some six miles from Fort Washakie. The evidence also established that the state school serving Fort Washakie, and located about two and one-half miles from the Blue Bull, had a total enrollment of 243 students, 223 of whom were Indian.

Other evidence bearing on whether the Blue Bull was located in a non-Indian community was Martin Mazurie's testimony that the bar served both Indians and non-Indians, and that: "We are kind of out there by ourselves, you know." App. 70. A transcript of the hearing on

that the § 1154 (c) statutory exceptions are not applicable. Because of this assumption, and because we conclude that the Government in any event did carry this burden, we need not consider whether the exception must be pleaded and proved by criminal defendants. Cf. *United States* v. *Vuitch,* 402 U. S. 62, 70 (1971) (dealing with a criminal statute in which "an exception is incorporated in the *enacting clause* of a statute"). (Emphasis supplied.)

the Mazuries' application to the tribes for a retail liquor license was also admitted at the trial. That transcript indicates that the Blue Bull was located near a public housing development populated largely if not entirely by Indians. Residents of this development complained that persons leaving the bar late at night, and for one reason or another having either no transportation or no destination, would wander into the development.

There was no testimony that the Blue Bull was in a non-Indian community. The defense did obtain acknowledgments by prosecution witnesses that they could not precisely state the boundaries of the Fort Washakie *Indian* community. Otherwise, examination by the defense was directed at establishing that the term "Indian" was without precise meaning, and that the State of Wyoming generally had jurisdiction over non-Indians and their lands within the reservation.

We think that the foregoing evidence was sufficient to justify the District Court's implied conclusion that Fort Washakie and its surrounding settlements did not compose a non-Indian community. We do not read the opinion of the Court of Appeals as reaching a conclusion contrary to that which we have just stated. That court instead based its decision on the proposition that such proof did not go far enough, a view generated by its opinion of the requirements this statute must meet in order to avoid the vice of vagueness. The Court of Appeals was looking for proof beyond a reasonable doubt of precisely defined concepts of "Indian" and "community." We gather that it expected persons treated as "Indians" in the housing and school surveys to be proved to satisfy a specific statutory definition. Similarly, it apparently expected that proof concerning the "community" should have conformed to some specific statutory definition, presumably one keyed to a geographical area with precise boundaries.

We believe that the Court of Appeals erred by holding that the Constitution requires proof of such precisely defined concepts. The prosecution was required to do no more than prove that the Blue Bull was not located in a non-Indian community, where that term has a meaning sufficiently precise for a man of average intelligence to "reasonably understand that his contemplated conduct is proscribed." *United States* v. *National Dairy Products Corp.,* 372 U. S., at 32–33. Given the nature of the Blue Bull's location and surrounding population, the statute was sufficient to advise the Mazuries that their bar was not excepted from tribal regulation by virtue of being located in a non-Indian community.[10]

### III

The Court of Appeals expressed doubt that "the Government has the power to regulate a business on the land it granted in fee without restrictions." 487 F. 2d, at 18. Because that court went on to hold that even if Congress did possess such power, it could not be delegated to an Indian tribe, that court did not find it necessary to

---

[10] We note that the § 1154 (c) exception is available for fee-patented lands which *are* in *non-Indian* communities, rather than for those which *are not* in *Indian* communities. This fact renders irrelevant the inability of prosecution witnesses to specify precise boundaries of the Fort Washakie *Indian* community.

We need not detain ourselves with an issue which seemed to cause the Court of Appeals some difficulties, that of what qualifies a person as an "Indian." The record plainly establishes that, in the circumstances of this case, the distinction between Indians and non-Indians was generally understood. Those who testified about the housing and school surveys displayed no difficulty in making such classifications. Nor did Mr. Mazurie. He testified that when there was trouble at his bar he would call the county sheriff to deal with a non-Indian, but would call the tribal police to deal with an Indian. When his counsel questioned him as to how he determined which was which, he simply replied: "Because I knew them." App. 70.

resolve the issue of congressional power. We do, however, reach the issue, because we hereinafter conclude that federal authority was properly delegated to the Indian tribes. We conclude that federal authority is adequate, even though the lands were held in fee by non-Indians, and even though the persons regulated were non-Indians.

Article I, § 8, of the Constitution gives Congress power "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." This Court has repeatedly held that this clause affords Congress the power to prohibit or regulate the sale of alcoholic beverages to tribal Indians, wherever situated, and to prohibit or regulate the introduction of alcoholic beverages into Indian country.[11] *United States* v. *Holliday,* 3 Wall. 407, 417–418 (1866); *United States* v. *Forty-three Gallons of Whiskey,* 93 U. S. 188, 194–195 (1876); *Ex parte Webb,* 225 U. S. 663, 683–684 (1912); *Perrin* v. *United States,* 232 U. S. 478, 482 (1914); *Johnson* v. *Gearlds,* 234 U. S. 422, 438–439 (1914); *United States* v. *Nice,* 241 U. S. 591, 597 (1916).

*Perrin* v. *United States, supra,* demonstrates the controlling principle. It dealt with the sale of intoxicating beverages within premises owned by non-Indians, on privately held land in an organized non-Indian municipality. The land originally had been included in the Yankton Sioux Indian Reservation, but had been ceded to the United States. The cession agreement, as ratified and confirmed by Congress, specified that alcoholic beverages would never be sold on the ceded land. The land

---

[11] It is undisputed that the Wind River Tribes have not been emancipated from federal guardianship and control. There is thus no doubt that this case is properly analyzed in terms of Congress exclusive constitutional authority to deal with Indian tribes.

was subsequently opened to private non-Indian settlers. In upholding Perrin's conviction, this Court stated:

> "The power of Congress to prohibit the introduction of intoxicating liquors into an Indian reservation, wheresoever situate, and to prohibit traffic in such liquors with tribal Indians, whether upon or off a reservation and whether within or without the limits of a State, does not admit of any doubt. It arises in part from the clause in the Constitution investing Congress with authority 'to regulate commerce with foreign nations, and among the several States, and with the Indian tribes,' and in part from the recognized relation of tribal Indians to the Federal Government." 232 U. S., at 482.

*Seymour* v. *Superintendent,* 368 U. S. 351 (1962), is a more recent indication of congressional authority over events occurring on non-Indian land within a reservation. The case concerned an Indian's challenge to a state burglary conviction. The Indian contended that because the offense took place within "Indian country," it was within the exclusive jurisdiction of the United States by virtue of 18 U. S. C. § 1153. This Court agreed, despite the fact that the crime occurred on land patented in fee to non-Indians. While the opinion did not address the constitutional issue, it did reject a variety of statutory arguments for excluding the crime's situs from 18 U. S. C. § 1151's definition of "Indian country." Of significance for our purposes is the fact that Congress' authority to define "Indian country" so broadly, and to supersede state jurisdiction within the defined area, went both unchallenged by the parties and unquestioned by this Court.

We hold that neither the Constitution nor our previous cases leave any room for doubt that Congress pos-

sesses the authority to regulate the distribution of alcoholic beverages by establishments such as the Blue Bull.

## IV

The Court of Appeals said, however, that even if Congress possessed authority to regulate the Blue Bull, it could not delegate such authority to the Indian tribes. The court reasoned as follows:

> "The tribal members are citizens of the United States. It is difficult to see how such an association of citizens could exercise any degree of governmental authority or sovereignty over other citizens who do not belong, and who cannot participate in any way in the tribal organization. The situation is in no way comparable to a city, county, or special district under state laws. There cannot be such a separate 'nation' of United States citizens within the boundaries of the United States which has any authority, other than as landowners, over individuals who are excluded as members.

> .      .      .      .      .

> "The purported delegation of authority to the tribal officials contained in 18 U. S. C. § 1161 is therefore invalid. Congress cannot delegate its authority to a private, voluntary organization, which is obviously not a governmental agency, to regulate a business on privately owned lands, no matter where located. It is obvious that the authority of Congress under the Constitution to regulate commerce with Indian Tribes is broad, but it cannot encompass the relationships here concerned." 487 F. 2d, at 19.

This Court has recognized limits on the authority of Congress to delegate its legislative power. *Panama Refining Co.* v. *Ryan,* 293 U. S. 388 (1935). Those limitations are, however, less stringent in cases where the entity

exercising the delegated authority itself possesses independent authority over the subject matter. *United States* v. *Curtiss-Wright Export Corp.*, 299 U.S. 304, 319–322 (1936). Thus it is an important aspect of this case that Indian tribes are unique aggregations possessing attributes of sovereignty over both their members and their territory, *Worcester* v. *Georgia*, 6 Pet. 515, 557 (1832); they are "a separate people" possessing "the power of regulating their internal and social relations . . . ," *United States* v. *Kagama*, 118 U.S. 375, 381–382 (1886); *McClanahan* v. *Arizona State Tax Comm'n*, 411 U.S. 164, 173 (1973).

Cases such as *Worcester, supra,* and *Kagama, supra,* surely establish the proposition that Indian tribes within "Indian country" are a good deal more than "private, voluntary organizations," and they thus undermine the rationale of the Court of Appeals' decision. These same cases, in addition, make clear that when Congress delegated its authority to control the introduction of alcoholic beverages into Indian country, it did so to entities which possess a certain degree of independent authority over matters that affect the internal and social relations of tribal life. Clearly the distribution and use of intoxicants is just such a matter. We need not decide whether this independent authority is itself sufficient for the tribes to impose Ordinance No. 26. It is necessary only to state that the independent tribal authority is quite sufficient to protect Congress' decision to vest in tribal councils this portion of its own authority "to regulate Commerce . . . with the Indian tribes." Cf. *United States* v. *Curtiss-Wright Export Corp., supra.*

The fact that the Mazuries could not become members of the tribe, and therefore could not participate in the tribal government, does not alter our conclusion. This claim, that because respondents are non-Indians Congress

could not subject them to the authority of the Tribal Council with respect to the sale of liquor,[12] is answered by this Court's opinion in *Williams* v. *Lee*, 358 U. S. 217 (1959). In holding that the authority of tribal courts could extend over non-Indians, insofar as concerned their transactions on a reservation with Indians, we stated:

> "It is immaterial that respondent is not an Indian. He was on the Reservation and the transaction with an Indian took place there. The cases in this Court have consistently guarded the authority of Indian governments over their reservations. Congress recognized this authority in the Navajos in the Treaty of 1868, and has done so ever since. If this power is to be taken away from them, it is for Congress to do it. *Lone Wolf* v. *Hitchcock*, 187 U. S. 553, 564–566." *Id.*, at 223 (citations omitted).

---

[12] Respondents attempt to bolster this claim with the argument that "the basic rights and principles of equal protection and due process [are] currently not available to non-Indians within the tribal councils." Brief for Respondents 24. However, respondents make no claim that the tribal decision to deny them a license constituted a denial of equal protection or that it resulted from a hearing which lacked due process. Whether and to what extent the Fifth Amendment would be available to correct arbitrary or discriminatory tribal exercise of its delegated federal authority must therefore await decision in a case in which the issue is squarely presented and appropriately briefed. This observation is also applicable with regard to § 202 of Pub. L. 90–284, 82 Stat. 77, 25 U. S. C. § 1302, which provides: "No Indian tribe in exercising powers of self-government shall . . . (8) deny to any person within its jurisdiction the equal protection of its laws or deprive any person of liberty or property without due process of law." Quite apart from these potential sources of protection against arbitrary tribal action, such protection is to some extent assured by § 1161's requirement that delegated authority be exercised pursuant to a tribal ordinance which itself has been approved by the Secretary of the Interior.

For the foregoing reasons the judgment of the Court of Appeals must be reversed, and the convictions of respondents reinstated.

*Reversed.*