**UNITED STATES of America**

v.

**MISSION GOLF COURSE, INC.**

**UNITED STATES of America**

v.

**CITY OF MISSION.**

Nos. Civ. 80–3073, Civ. 80–3074.

United States District Court,
C.D. South Dakota.

Oct. 12, 1982.

---

Terry L. Pechota, Native American Rights Fund, Boulder, Colo., for plaintiff.

Stanley E. Whiting, Day, Grossenburg & Whiting, Winner, S. D., for defendants.

## MEMORANDUM OPINION

DONALD J. PORTER, District Judge.

### CASE SUMMARY

Plaintiff United States brought these two actions, seeking to enjoin defendants Mission Golf Course and the City of Mission from the sale of any intoxicating beverage on the Rosebud Sioux Indian Reservation except in conformity with the liquor ordinance adopted by the Rosebud Sioux Tribe. Having found that the evidence presented at the trial of these two cases fails to establish [1] that defendants are located in a "non-Indian community" within the meaning of 18 U.S.C. §§ 1154, 1161, the Court must grant the permanent injunction plaintiff seeks.

### LEGAL BACKGROUND

The first statute governing the determination of this case is 18 U.S.C. § 1154, which provides in pertinent part that:

(a) . . . whoever introduces or attempts to introduce any malt, spirituous, or vinous liquor, including beer, ale, and wine, or any ardent or intoxicating liquor of any kind whatsoever into the Indian country, shall, for the first offense, be fined not more than $500 or imprisoned not more than one year, or both; and, for each subsequent offense, be fined not more than $2,000 or imprisoned not more than five years, or both.

(c) the term "Indian country" as used in this section does not include fee-patented lands in non-Indian communities or rights-of-way through Indian reservations, and this section does not apply to such lands or rights-of-way in the absence of a treaty or statute extending the Indian liquor laws thereto.

The second statute which has application here is 18 U.S.C. § 1161:

The provisions of sections 1154 . . . of this title shall not apply within any area that is not Indian country, nor to any act or transaction within any area of Indian country provided such act or transaction is in conformity both with the laws of the State in which such act or transaction occurs and with an ordinance duly adopted by the tribe having jurisdiction over such area of Indian country, certified by the Secretary of the Interior, and published in the Federal Register.

Only a few cases have attempted to define precisely what is a "non-Indian community", as that term is used in this statutory framework. The leading case, *United States v. Mazurie*, 419 U.S. 544, 95 S.Ct. 710, 42 L.Ed.2d 706 (1975) found that a bar located on the outskirts of Fort Washakie, Wyoming, within the boundaries of the Wind River Reservation, was not located in a non-Indian community. The Court noted that Fort Washakie was the location of the Wind River Agency of the Bureau of Indian Affairs, and of the Tribal Headquarters of the tribes on the reservation; that the population within the 20 square miles surrounding the bar was heavily Indian, that the students in the public school serving Fort Washakie were mostly Indian; and that the bar was "near a public housing development populated largely if not entirely by Indians." 419 U.S. at 552, 95 S.Ct. at 715. The Court concluded from this evidence that, "[g]iven the nature of the [bar's] location and surrounding populations, the . . . bar was not excepted from tribal regulation by virtue of being located in a non-Indian community." 419 U.S. at 553, 95 S.Ct. at 715.

---

**1.** *United States v. Morgan*, 614 F.2d 166, 169 n.8 (8th Cir. 1980).

A somewhat more detailed exposition of this subject was made in *United States v. Morgan,* 614 F.2d 166 (8th Cir. 1980). Two liquor establishments within the Standing Rock Sioux Indian Reservation in South Dakota were there under consideration: one at a locality called Mahto ten miles east of McLaughlin, South Dakota, and one called the Cattleman's Saloon, three-quarters of a mile from McLaughlin. (It was recognized in the opinion that McLaughlin was a non-Indian community.) Mahto, historically, had been inhabited predominantly by non-Indians; of the 27 people using Mahto as a polling place, 24 were non-Indian; it was claimed that 95 percent of the business at the bar was non-Indian; the law and order and other governmental services were provided by the county and township, rather than by the tribe and United States; the former public school at Mahto had been used by almost entirely non-Indian pupils; and it appeared that few Indians did business in Mahto. The court found that Mahto was a non-Indian community:

> The federal statute uses the term "community" and not "town," "city" or incorporated entity with a minimum population. Basic to the definitions of "community" which we have reviewed is the existence of an element of cohesiveness. This apparently can be manifested either by economic pursuits in the area, common interests, or needs of the inhabitants as supplied by that locality. Cohesiveness or common interests can be more necessary to the existence of a community than can mere density of population. We believe that the political and social focal point which the Mahto locality provides year round for the surrounding township could give a man of average intelligence the understanding that as an inhabitant in this area, he lived in a "community." As a large percentage of such inhabitants are non-Indian and the history and back-

ground of the area is non-Indian, we believe it can be said that Mahto is a community serving the non-Indian inhabitants of the township.

614 F.2d at 170. As for the Cattleman's Saloon, the court observed that this establishment was entirely surrounded by deeded non-Indian land, all governmental services to the bar were from the nearby town of McLaughlin, and 70 percent of the bar's business came from non-Indian residents of McLaughlin. In the court's view, the Cattleman's Saloon was part of the non-Indian community of McLaughlin "even though it is not technically within the town's incorporated boundaries. The statute's exception requires only that [the] business be 'in a non-Indian community itself. [The] business serves the area of McLaughlin and is in all respects within that community of interest and influence.'" 614 F.2d at 170–71.[2]

Though not directly on point, several other cases deal with the question of what constitutes a dependent Indian community under 18 U.S.C. § 1151(b), and establish factors which are relevant to the Court's inquiry here. *United States v. State of South Dakota,* 665 F.2d 837 (8th Cir. 1981); *Weddell v. Meierhenry,* 636 F.2d 211 (8th Cir. 1980); *United States v. Mound,* 477 F.Supp. 156 (D.S.D.1979).

■ Taken together, the cases cited, *supra,* dictate several points to be considered in deciding what is a non-Indian community. These factors are principally:

(1) Racial composition of the population in the area, both historically and at the present time, and the extent of this population's use of area services other than the liquor establishments at issue;

(2) A comparison of the roles of state, federal, and tribal governments in the area;

---

2. A third case, discussed by the court in *Morgan,* is *Berry v. Arapahoe & Shoshone Tribes,* 420 F.Supp. 934 (D.Wyo.1976), where the court found that a liquor establishment was not within a non-Indian community. The area at issue in *Berry* was rural, and although there were no Indians living within three miles of the busi-

ness, there were Indian residents within five miles, the nearest community of any size was thirty miles away, and the area around the business had historically been subject to tribal and federal jurisdiction and generally regarded as part of the reservation.

(3) Title to the land in the area; and

(4) Racial composition of the clientele of the establishments selling liquor.

The Court will therefore turn to an examination of the evidence in this case in light of these factors.

## FACTUAL DISCUSSION

### I.

*Racial Composition of the Area Population in the Past.*

The City of Mission is located in Todd County, South Dakota, within the exterior boundaries of the Rosebud Sioux Indian Reservation. (The boundaries of Todd County correspond with the Reservation boundaries with the exception of certain lands and/or communities in Mellette, Gregory, Tripp and Lyman Counties). The City, which is 15 miles from the northern boundary of Todd County, 22 miles from the southern boundary, 23 miles from the eastern boundary, and 30 miles from the western boundary, was originally platted in about 1913 in the vicinity of St. Mary's Mission, after which the City was named. The Rosebud Indian Boarding School, operated by the United States, a Catholic Church, and an Episcopal Church were also located in this area. Willis Groves, a witness called by defendants, moved into Mission in 1917, and testified that of the few businesses in Mission at that time, six were non-Indian, and four were Indian. The City was incorporated under South Dakota state law in 1932. The 1940 census shows that there were 307 non-Indians and 145 Indians then living in Mission, or a 33% Indian population. There is apparently no breakdown in the 1950 census, but the 1960 report shows 337 non-Indians and 274 Indians in Mission, or a 44.7% Indian population. In 1970, there were 438 non-Indians and 301 Indians, or a 41% Indian population.

The population of Todd County as a whole since 1930 appears to have been roughly as follows:

| | |
|---|---|
| 1930—47% Indian | 53% non-Indian |
| 1940—54% Indian | 46% non-Indian |
| 1950—56% Indian | 44% non-Indian |
| 1960—58% Indian | 42% non-Indian |
| 1970—70% Indian | 30% non-Indian. |

*Racial Composition of the Area Population.*

According to the 1980 census, the City of Mission had a population of 748. Of that total, 376 or 50.28% of the City population was Indian. Also, according to the 1980 census, Todd County as a whole had a population of 7,328, with 5,688 or 77.6% of the County population being Indian. In the two 1980 census districts immediately to the east of the City of Mission, which seem to consist principally of a tribal housing development known as Antelope Community, there is an additional population of 757 people, of whom 717 or 97% are Indian. In the 1980 census district immediately to the south of the City of Mission, which seems to consist mainly of a complex of Todd County school buildings, with housing for teachers, federal government personnel, and some students, there is a total population of 232, of whom 110 or 47% are Indian.

*Use of Area Services Other Than the Liquor Establishments At Issue.*

Of the approximately 40 privately owned businesses in the City, 15 are owned by persons of at least some degree of Indian ancestry. There was somewhat conflicting testimony as to the proportional use of these businesses by Indians and non-Indians, with the owners of the Mission Shopping Center, the bowling alley (which includes a restaurant, dance area and bar under license of the City), a motel, laundry and drive-in, indicating that from 75% to 90% of their business is derived from Indians. On the other hand, the owners of the auto parts store, a service station, feed and seed store, a lumber and hardware business, a department store, and the manager of a Farmers Co-op Oil Association indicated that from 20% to about 45% of their business was derived from Indians.

The evidence established that the City of Mission was the principal shopping area for the large Indian population in the nearby housing development of Antelope Community, the inhabitants of the school and

government housing complex to the south and, indeed, the testimony clearly showed that the City of Mission is the commercial focal point of Todd County.

Antelope Community, the evidence showed, is also almost completely devoid of non-commercial services, and the Indian people living in Antelope Community regularly go to the City of Mission to pick up their mail, to participate in the state Aid to Dependent Children program, to obtain aid from Dakota Plains Legal Services (which has a clientele of from 85% to 90% Indian), and to go to church. Further, the children of Antelope Community attend the public schools in and around the City of Mission. Todd County High School, located just to the south of the City, serves the entire county and has an Indian enrollment of 294, and a non-Indian enrollment of 92. A number of Indian students, 52 at the time of the trial, live in a dormitory on the High School grounds.

It might also be noted that of the six members on the Mission City Council, two are Indian, and of the five Todd County School Board members, all elected at large in Todd County, two are Indian.

## II.

*Comparative Roles of State, Tribal and Federal Governments.*

*State.* The City of Mission is incorporated and organized under South Dakota law, and is regularly audited under state law. The City has a police force, and maintains a municipal jail, a gymnasium, a fire hall, a municipal office, and a municipal swimming pool and park. The City maintains its own streets, water and sewer system. (A new sewer system for the joint use of the City and Antelope Community is planned). A number of state and county offices are also located in the City, including offices of the State Department of Social Services, and the State Department of Public Safety, the County Assessor, the Sheriff and the Civil

Defense officer. The City of Mission also has a volunteer fire department, with equipment purchased by the City. It should be noted, however, that the City cooperates with the Bureau of Indian Affairs (BIA) in fire protection, and an agreement exists whereby the Mission volunteer fire department is reimbursed by the BIA for certain of its costs in fire fighting on Indian land. The State has criminal jurisdiction only over crimes committed by non-Indians against non-Indians.

*Tribal.* There appear to be no tribal offices located within the City of Mission itself. There are several tribal offices located in Antelope Community, however, including a tribal lumber company, a commodity warehouse, a school for the mentally retarded, a Headstart Center, and an alcohol recovery center. There is also a tribal child welfare program administered at the Todd County High School complex. The housing in Antelope Community itself was constructed by a tribal entity beginning in 1965, and this entity continues to administer some of the housing. The Indian people of Antelope and the City of Mission together elect five representatives to the Rosebud Sioux Tribal Council and also elect the members of a community organization. An unmanned airport near the City of Mission was built on tribal land, and is maintained by the tribe. The state sales tax collected by the businesses in the City of Mission is distributed 75% to the tribe and 25% to the state, pursuant to an agreement between the tribe and the State of South Dakota.

The Tribe exercises jurisdiction over misdemeanor crimes involving Indian defendants throughout Todd County and including the City of Mission.

*Federal.* There are no federal government offices within the boundaries of the City of Mission; however, there are a substantial number of Bureau of Indian Affairs offices located in the Todd County High School complex. The BIA owns a number of the buildings in the complex.[3] It maintains a

---

3. 28 government quarters, 1 fourplex apartment, 1 fourplex garage, 1 fire station, 1 maintenance shop, 2—160 pupil dormitories, 1 kitchen dining hall, 2—2 stall garages, 1 water tower, 2 pump houses, 1 fire truck, and approximately 11 acres of land.

Social Services branch, an Education branch, Facility Management branch, and Employment Assistance branch at the complex, and plans to move a considerable number of its functions to the complex in the next two years. At present, the BIA Social Services office at the complex administers assistance to 400 families in the area. The BIA maintains a dining room at the complex which serves morning and evening meals to the Indian students living in the dormitories at the complex, and serves lunches to the entire school population. The Indian Health Service (IHS) also operates a dental office within the High School complex. The Todd County School System receives federal funds for the purpose of providing supplementary education services to Indian children.

The BIA administers programs to help Indian people get started in business; several of those so helped are in business in the City of Mission. Municipal services in Antelope Community Housing Development, including police protection, water and sewer services, and road maintenance, are provided by the BIA, the IHS, and the Tribe, and fire protection is provided jointly by the BIA and the Mission volunteer fire department.

All felonies committed by an Indian, or any offense by a non-Indian against an Indian, at any location in Todd County, including the City of Mission, are under the jurisdiction of the United States. 18 U.S.C. §§ 1152, 1153, 13.

### III.

*Title to Land in the Area.*

All land within the City of Mission, except for approximately twelve lots, is owned in fee simple by individuals, churches, corporations, or governmental units (including the land where the Mission municipal liquor store is located). The property where defendant Mission Golf Course is located is also held in fee simple.

The evidence on land title in Todd County as a whole is conflicting. A report compiled by the Bureau of Indian Affairs showed a total of 890,495 acres in the county, with 582,625 acres or 65% held in trust by the United States for the tribe or individual Indians. A report prepared by the Todd County Director of Equalization, on the other hand, showed a total of 890,870 acres in the county, with 504,815 acres or about 57% held in trust.

### IV.

*Racial Composition of the Clientele of the Establishments Selling Liquor.*

*Mission Municipal Liquor Store.* In 1956, the people of the City of Mission voted to permit the City to obtain a license from the state for the sale of liquor and the license was obtained in that year. There was no precise evidence as to the usage of the liquor store, but the testimony did tend to establish that the store's patronage was largely, perhaps in the range of 80%, Indian, representing customers not only from the immediate Mission area but from throughout the reservation.

*Mission Golf Course.* The Mission Golf Course was incorporated in March, 1964, under South Dakota law. It is located about two miles south of the City of Mission. All of the seven incorporators were from Mission; none were Indians. There were sixteen original shareholders; one was Indian. The club house on the golf course has operated under a state liquor license since 1965.

There are currently 36 stockholders in the golf course, of whom five are Indian. Of the approximately 280 current members, the percentage of Indian members was generally agreed to be about 50%. The golf course serves all of Todd County. The precise percentage use of the golf course facilities is rather unclear, although it appeared that fewer Indians used the golf course itself than did non-Indians. As for the club house, where liquor is served, the average percentage of use by Indian patrons seems to range from 50% to 65%, with greater or lesser percentages depending on the time of the week.

## LEGAL DISCUSSION

### I.

■ The Court has little difficulty in finding from the evidence briefly outlined above that defendants City of Mission and the Mission Golf Course are not located within non-Indian communities, as that term is defined in the statutes and case law.[4] Defendants seem to imply that this Court is limited solely to an examination of the City of Mission within its legal boundaries. Yet, every case dealing with the concept of a "non-Indian community" has looked to the surrounding territory. In *Mazurie*, the Supreme Court considered the nature of the twenty square miles surrounding the bar, and found it to be primarily Indian; here, the population within just a few square miles around the defendants is primarily Indian. In *Mazurie*, the schools serving the area were attended predominantly by Indians; the same must be found here. In *Mazurie*, the bar was near public housing inhabited almost entirely by Indians; here again, the same is true. Unlike the locality of Mahto in *Morgan*, the Mission area seems to have always had a very substantial, and now predominantly, Indian population; unlike Mahto, the majority of the patrons of the liquor establishments at Mission are Indian; unlike Mahto, the tribe and the United States provide at least part of the law and order services in the City of Mission; and unlike Mahto, great numbers of Indians do their business in the Mission area. As the Eighth Circuit said in *Morgan*, "[b]asic to the definitions of 'community' ... is the existence of an element of cohesiveness." 614 F.2d at 170.

The sum total of the various ways the Indian presence in Mission is manifest demonstrates "an element of cohesiveness" which is inconsistent with a view of Mission and surrounding area as a "non-Indian community." It is true that there are substantial non-Indian elements to the area, but it cannot be said that these elements predominate. Put in the terms used in *Morgan*, the business, educational and social "focal point which the [Mission] locality provides year round for the surrounding [housing areas, and indeed, county] could give a man of average intelligence the understanding that as an inhabitant in this area, he lived in a 'community.' *Id.* Given the totality of evidence in this case, defendants have failed to prove that this 'community', which includes the City of Mission and surrounding environs, is "non-Indian."

### II.

Defendants also raise, but do not strongly press, the contention that the two liquor establishments, or at least the Mission liquor store, are in relatively close proximity to a highway, and thus come under the other exception in 18 U.S.C. § 1154(c) of a right-of-way through a reservation. The establishments, however, are not directly in the highway itself, and there is no evidence that the entity holding title to or right to possession of the highway right of way has, or will authorize defendants to use any portion for the sale of liquor.

Moreover, this issue was not raised at trial and is thus not properly before the Court. The contention is overruled.

### III.

■ Defendants further raise a number of separate issues under the due process and equal protection clauses of the United States Constitution with regard to the power of the Tribe to regulate defendants' liquor sales. First, defendants point out that non-members of the Tribe cannot vote in Tribal elections, and seize upon the trial

---

4. It is true that a 1951 United States Department of Interior memorandum finds that Mission was a non-Indian community. Whatever the validity of this finding in 1951, it is of little significance more than thirty years later. It is fundamental that as the needs and circumstances of Indians change, so must "the method of supervision over them by the United States ... change." *United States v. Mound,* 477 F.Supp. 156 (D.S.D.1979).

Defendants also rely on a 1971 opinion of the South Dakota state Attorney General that Mission was exempt from the federal liquor statutes. This letter is unpersuasive, and is not binding upon this Court.

**1184**

testimony of one Tribal council member that he would never vote to place a non-member of the Tribe on the Tribal Liquor Commission. Assuming that fictional "persons" such as the City and the Golf Course have standing to urge a claim of racial discrimination, it must still be observed that the Tribal liquor ordinance, Vol. 43, Fed. Reg. # 199, Oct. 13, 1978, p. 47,291, does not expressly restrict service on the liquor commission to Tribal members. The evidence suggests that non-Indians have been appointed on the board of the Rosebud Housing Authority, another Tribal entity, and the statement of one tribal counsel member cannot be taken to represent tribal policy. The evidence, therefore, does not support defendants' claim, and the issue must be resolved in plaintiff's favor. *See also Holt Civil Club v. Tuscaloosa,* 439 U.S. 60, 69–70, 99 S.Ct. 383, 389, 58 L.Ed.2d 292 (1978); *United States v. Mazurie, supra,* 419 U.S. at 557, 95 S.Ct. at 717.

■ Defendants argue that the language of the Tribe's liquor ordinance would improperly impose liability on "a vendor who legally sells intoxicants to a sober person who subsequently gives the intoxicants to a friend or relative who later becomes intoxicated by drinking the liquor and is involved in an accident." The language of the two sections giving rise to this purported result states, in Section 8 of Chapter 19, that the applicant for a liquor license must have insurance that will pay claims "which the applicant shall become legally obligated to pay as damages because of bodily injury, property damage, or death *proximately caused* to himself or others by any person who becomes intoxicated by the consumption of alcohol sold by the applicant;" Section 9 of Chapter 19 states that any "person suffering bodily injury, property damage, or death *proximately caused* by any person becoming intoxicated by the consumption of alcohol sold by the applicant shall have a cause of action against the applicant for such damage sustained." (Emphasis supplied). It is the Court's view that the use of the term "proximate cause" in the ordinance clearly restricts a liquor store's liability to proper limits; as the legal definition of "proximate cause" implies, the liquor sale must be a cause of the damage and have created a condition or chain of events which was continuous and active up to the time of the damage, with the lapse of time between the sale and the damage being taken into account. In this light, then, there is no merit to the assertion that "causation is not a factor in the tribal ordinance," and defendants' allegations on this issue must be rejected.

■ Finally, defendants contend that Section 4 of Chapter 19 of the liquor ordinance requires all corporations seeking a tribal license to be organized under the laws of the Tribe. The City of Mission apparently argues that it is legally impossible for it to organize under Tribal law, but whether such organization is in fact barred to the City, the Court has no difficulty in finding that defendants have misread the ordinance. Section 4 states:

Any corporation seeking a license for the sale of liquor must be a corporation organized under the laws of the Rosebud Sioux Tribe, provided, however, that if the applicant is a foreign corporation, it shall be eligible if, prior to the application, it has complied with the laws of the Rosebud Sioux Tribe and the United States concerning doing business within the Rosebud Reservation.

Section 35(3) of Chapter 17 of the Ordinance defines foreign corporation as "any corporation not incorporated under the laws of the Rosebud Sioux Tribe." There appears no reason why the City cannot qualify as a "foreign corporation" under these sections, nor have defendants shown any reason why it would be impossible for the City to comply "with the laws of the Rosebud Sioux Tribe and the United States concerning doing business within the Rosebud Reservation." The Court, accordingly, can see no basis for the contention that Section 4 of Chapter 19 would necessarily "prohibit the issuance of a liquor license to the City of Mission;" thus, this issue too must be resolved against defendants.

For all the reasons given, therefore, judgment must be entered for plaintiff, and defendants are permanently enjoined from any sale of any intoxicant, except in conformity with the tribal liquor ordinance, and South Dakota law.

This memorandum opinion constitutes the Findings of Fact and Conclusions of Law of the Court.