**UNITED STATES of America, Plaintiff-Appellee,**

v.

**David LEE, Defendant-Appellant.**

**No. 86–5578.**

United States Court of Appeals, Fourth Circuit.

Argued Jan. 8, 1987.

Decided April 6, 1987.

Rehearing Denied May 5, 1987.

David Alan Hirsch (Kenneth Roger Weiner; Weiner, Weiner & Weiner, Fairfax, Va., on brief), for defendant-appellant.

Sandra Strempel, Sp. Asst. U.S. Atty. (Henry E. Hudson, U.S. Atty., Alexandria, Va., on brief) for plaintiff-appellee.

Before PHILLIPS and ERVIN, Circuit Judges, and MERHIGE, Senior United States District Judge for the District of Virginia, sitting by designation.

JAMES DICKSON PHILLIPS, Circuit Judge:

David S. Lee here appeals his conviction in United States District Court for the Eastern District of Virginia on six separate counts involving fraudulent credit card transactions. Lee complains that the statute on which four of the counts were premised, 18 U.S.C. § 1029, is unconstitutionally vague, and that the district court lacked jurisdiction under it. In addition, he insists that the indictment was tainted by government misconduct before the grand jury, and that he was denied a fair trial by various rulings of the trial judge. We find Lee's arguments unpersuasive and affirm his conviction.

I

Lee is a partner and operator of Diamonds Unlimited, a retail jewelry store located in Springfield Mall in Fairfax County, Virginia. On February 26, 1986, a federal grand jury indicted Lee on four counts of violating provisions of 18 U.S.C. § 1029,

which reaches fraud in connection with "access devices" such as credit cards. The grand jury also indicted Lee on two counts of violating 18 U.S.C. § 1343, which reaches, *inter alia*, use of interstate telephone calls to further a scheme to defraud.

At Lee's bench trial, the government offered evidence that Lee participated in a conspiracy involving fraudulent credit card transactions between October 1984 and October 1985. The government's essential allegation was that Lee accepted purchases on credit cards he knew to be stolen and submitted the forged receipts to his credit card accounts for payment. The government offered three principal sources of evidence at Lee's trial. First the government showed that Lee made a high percentage of charges to his credit card accounts on forged credit card receipts from stolen cards. Second, the government produced testimony from a female undercover Secret Service Agent who presented to Lee, and made purchases on, credit cards in various male names on three separate occasions. Third, and most importantly, the government presented a witness who admitted stealing credit cards from patrons at a movie theatre in Springfield Mall and then using the stolen cards to make purchases from Lee. This witness testified that she made purchases from Lee on 80 or more stolen cards during the period in question. Her testimony was at least partially corroborated by the testimony of victims and by a handwriting expert who identified her signature on forged credit card receipts from Lee's store.

At the conclusion of Lee's bench trial, the trial judge convicted Lee for conspiring to use an "unauthorized access device," 18 U.S.C. § 1029(b)(2), as well as knowingly and intentionally using a "counterfeit access device" to defraud, 18 U.S.C. § 1029(a)(1). The trial judge also found Lee guilty of an attempt, 18 U.S.C. § 1029(b)(1), and of possessing a credit card imprinter with intent to defraud, 18 U.S.C. § 1029(a)(4). Finally, the trial judge convicted Lee on two counts of making interstate telephone calls to obtain authorization for the transactions in furtherance of the scheme to defraud. 18 U.S.C.

§ 1343. Lee was sentenced to two years imprisonment on each count, with the sentences to run concurrently, and ordered to make restitution of $34,539. Lee here appeals his conviction.

## II

Lee first argues that 18 U.S.C. § 1029 is unconstitutionally vague because its "prohibitions are not clearly defined" and fail to "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he can act accordingly." *Grayned v. City of Rockford*, 408 U.S. 104, 108, 92 S.Ct. 2294, 2298, 33 L.Ed.2d 222 (1972).

Congress explicitly designed this new statute, part of the Comprehensive Crime Control Act of 1984, to curb the growing and increasingly inventive use of "counterfeit" and "unauthorized" "access devices." The statute defines an "access device" as

any card, plate, code, account number, or other means of account access that can be used, alone or in conjunction with another access device, to obtain money, goods, services, or any other thing of value, or that can be used to initiate a transfer of funds (other than a transfer originated solely by paper instruments).

Section 1029(e)(1). A "counterfeit access device" is one which is "counterfeit, fictitious, altered, or forged, or an identifiable component of an access device or a counterfeit access device." Section 1029(e)(2). An "unauthorized access device" is one which is "lost, stolen, expired, revoked, canceled, or obtained with intent to defraud." Section 1029(e)(3). The Act reaches the intentional and fraudulent use of access devices, as well as attempts, conspiracy, and "control or custody" of device-making equipment with intent to defraud.

Lee argues that this statute is impermissibly vague and overbroad because Congress, in its effort to protect new and vulnerable types of funds transfer systems, left its definition of "access device" open ended. Since Lee's prosecution implicates no first amendment freedoms, this chal-

**974**

lenge "must be examined in the light of the facts of the case at hand." *United States v. Mazurie*, 419 U.S. 544, 550, 95 S.Ct. 710, 714, 42 L.Ed.2d 706 (1975). Lee himself, however, cannot plausibly lay claim to the belief that he could knowingly use a stolen credit card, or forged credit card receipt, to obtain an unauthorized payment. Although the language of the statute anticipates new forms of "access devices," it offers both adequate warning to defendants like Lee that their conduct is unlawful and adequate guidance to judges and juries. *United States v. Petrillo*, 332 U.S. 1, 67 S.Ct. 1538, 91 L.Ed. 1877 (1947). The statute is not invalid merely because some of its hypothetical applications might raise constitutional problems. *United States v. Raines*, 362 U.S. 17, 21–22, 80 S.Ct. 519, 522–23, 4 L.Ed.2d 524 (1960).

■ Lee also challenges the jurisdiction of the district court by pointing to § 1029(d), which provides in part: "[The] authority of the United States Secret Service [to investigate offenses under the statute] shall be exercised in accordance with an agreement which shall be entered into by the Secretary of the Treasury and the Attorney General." In effect, Lee argues that the government's failure to plead compliance with this section deprived the district court of subject-matter jurisdiction. Lee and the government, reaching outside the appellate record, disagree about whether the agreement referred to in § 1029(d) was in fact reached prior to the Secret Service investigation of Lee. This disagreement is irrelevant. There is simply nothing in the language of the statute or its legislative history to suggest that § 1029(d) imposes a jurisdictional requirement. On its face, the provision simply anticipates a division of enforcement responsibility between the Department of Justice and the Department of the Treasury.

■ Lee also argues that the government abused the grand jury process, tainting the indictment under which he was tried. Specifically, he argues that the government orchestrated the appearance of its principal witness, Lee's admitted co-conspirator, for maximum effect. When this witness made her dramatic appearance, Lee insists, she read from a written statement "recomposed" from an interview with government investigators, failed to inform the grand jury about her past criminal record, and inaccurately stated that she had previously "sworn" to her statement. The effect, he claims, was to mislead the grand jury.

None of these alleged "improprieties" materially affects the indictment. Although the witness read from a written and obviously edited statement, she consistently testified that she had made the same statements to investigators. While she never volunteered information about her past criminal activities, her unsavory personal history was implicit in her narrative and the grand jury never asked her about her past. Finally, although the written statement did not carry a jurat, any error in the witness' assertion that the statement was "sworn" was cured when she took an oath before reading the statement to the grand jury. In short, the government may have prepared and presented the witness for maximum dramatic effect, but it did nothing improper. Even if the evidence this witness offered had been inadequate or incompetent, which it was not, the indictment itself would still be valid. *United States v. Calandra*, 414 U.S. 338, 344–45, 94 S.Ct. 613, 618, 38 L.Ed.2d 561 (1974).

Finally, Lee offers a long list of complaints regarding the conduct and rulings of the trial judge. We fail to see the slightest merit in any of these miscellaneous complaints. Lee implicitly concedes that no one of these alleged errors requires reversal by claiming that their "cumulative effect" denied him due process. Because we find no errors at all, we reject Lee's contention that he was denied due process.

AFFIRMED.