HENRY, Circuit Judge,
joined by BRISCOE, Chief Judge, LUCERO, Circuit Judge, dissenting.
In this case, we must determine who regulates ground water injections containing radioactive substances on a tract of land surrounded by an Indian community. The majority holds that because the individual tract at issue was neither (a) “ ‘set aside’ by Congress (or the Executive, acting under delegated authority) ‘for the use of the Indians as Indian land[;]’ ” nor (b) “ ‘dependent’ in the sense that it is ‘under federal superintendence,’ ” it is not part of a dependent Indian community under 18 U.S.C. § 1151(b). Maj. op. at 1134-35 (quoting Alaska v. Native Vill. of Venetie Tribal Gov’t, 522 U.S. 520, 527, 531, 118 S.Ct. 948, 140 L.Ed.2d 30 (1998)). Judge Ebel’s well-crafted and well-reasoned dissent, which I join, applies the well-established community-of-reference standard, concludes that the Church Rock Chapter is the appropriate community of reference, and holds that the land at issue is within that dependent Indian community. As a result, in the dissent’s view, the land at issue is subject to federal environmental regulations.
I write separately to underscore the major concerns that I have with the majoiity opinion—which I fear undoes decades of settled Indian law based upon sound principles. First, in my view, it is the majority, not the dissent, that fails to tie “the jurisdictional determination to the proper hitch: the will of Congress.” Maj. op. at 1153. Second, the Supreme Court’s decision in United States v. Mazurie, 419 U.S. 544, 551, 95 S.Ct. 710, 42 L.Ed.2d 706 *1183 (1975), which remains good law after Vene-tie, supports the community-of-reference approach. Third, Venetie itself, the Supreme Court ease on which the majority grounds its rejection of the community-of-reference inquiry, did not involve non-Indian fee land surrounded by an Indian community and thus does not resolve the question before us. Fourth, I am not convinced that principles regarding the construction of criminal statutes should be applied here. Finally, and perhaps most importantly, the majority’s approach conflicts with one of the central purposes of the statute at issue—to avoid checkerboard jurisdiction.
In 18 U.S.C. § 1151(b), Congress used the word “communities.” A community is “a social group of any size whose members reside in a specific locality, share government, and have a common cultural and historic heritage.” Webster’s New Universal Una,bridged Dictionary, at 298 (1989); see also Dissent at 1171 (observing that the term “community” “implies the existence of some setting within which the property in question is to be evaluated”). Accordingly, in conducting a community-of-reference analysis that extends beyond the status of a particular parcel of land, it is the dissent and the panel opinion that are more firmly rooted in the words used by Congress.
As Judge Ebel also observes, the community-of-reference standard is supported by the Supreme Court’s decision in Mazurie, 419 U.S. at 551, 95 S.Ct. 710. There, in rejecting the contention that a non-Indian tract was part of “a non-Indian community ” under 18 U.S.C. § 1154(b) (emphasis added), the Court considered the area within the Wind River Reservation that surrounded that tract.[1] See id. (discussing evidence regarding “the 20-square-mile area roughly centered on [the non-Indian tract]”). The majority seeks to distinguish Mazurie on the grounds that “[although the terms ‘non-Indian communities’ and ‘dependent Indian communities’ both concern ‘communities,’ they deal with markedly different types of communities.” Maj. op. at 1158-59 n.20. I find that distinction unsatisfying. Surely, when Congress uses the same term in two related statutes, and when the widely accepted use of that term suggests context, see Dissent at 1171-72, we ought to apply the same definition unless there are particularly persuasive reasons not to do so. Here, I see no such reasons.
In particular, Venetie does not require us to abandon our established community-of-reference test with regard to the Section 8 land here at issue. Venetie did not involve land owned by a non-Indian mining corporation in fee simple located in the midst of trust land and allotments that constitute “Indian country” under the other subsections of § 1151. Thus, the Supreme Court’s decision does not tell us which particular lands we must consider in determining whether the set-aside and superintendence requirements have been met.
Additionally, I am not persuaded by the majority’s view that our interpretation of the statute “will apply to all criminal cases arising under § 1151(b).” Maj. op. at 1160. The EPA adopted § 1151’s definition of “Indian country” in the course of administering the Safe Drinking Water *1184 Act. Moreover, as Judge Ebel reasons, the concept of community should be afforded heightened importance in the natural resources context. See Dissent at 1174. It is that context that we consider here. I would leave the implications of our holding for hypothetical criminal prosecutions, if any, for actual cases in which prosecutions are brought regarding conduct in dependent Indian communities.
Further, I must take exception to the majority’s view that because some degree of checkerboard jurisdiction is inevitable in the application of § 1151, we may veer away from that fundamental concern in applying the concept of a dependent Indian community to the facts of this case. Leading Indian law scholars have told us that “a central purpose of the 1948 codification [of § 1151] was to avoid checkerboard jurisdiction.” See Felix S. Cohen, Handbook of Federal Indian Law § 3.04[2][c][iv], at 194 n.429 (2005 ed.) (citing Seymour v. Superintendent of Wash. State Penitentiary, 368 U.S. 351, 358, 82 S.Ct. 424, 7 L.Ed.2d 346 (1962)). I think we ought to listen to them, particularly when a non-Indian land owner proposes a mining operation that affects the surrounding community. In that circumstance, it makes good sense to treat Section 8 as part of that community and to require the mining operation to comply with federal law.
I take little comfort in the majority’s observation that, in the EPA’s judgment, the aquifer under HRI’s land “ ‘does not currently serve as a source of drinking water’ ” and “ ‘cannot now and will not in the future serve as a source of drinking water.’ ” Maj. op. at 1140 (quoting 40 C.F.R. § 146.4(a) & (b)). Even if that is true in this case, there are other effects of a mining operation that may greatly impact the surrounding lands. See Dissent at 1174 (noting that “[t]he externalities produced by a mining operation—including pollution, traffic, and the aesthetic harms created by having a large mining operation nearby—-also affect the surrounding community”).
Moreover, as one scholar has noted, previous mining operations in the area at issue have had grave consequences: “[t]he tailings from uranium mines have contaminated air, groundwater, streams and soil on the Navajo reservation. The wind blew dust from the tailings piles into Navajo homes and water sources. Holding ponds on the reservation associated with the uranium mines were not well-maintained. In 1979, a mud dam near Church Rock, Now Mexico[,] failed, spilling over 1,100 tons of uranium tailings, and an estimated 100 million gallons of radioactive wastewater into the Rio Puerco River. This is the largest nuclear spill in U.S. history, and it caused extensive damage to the Navajo people, their lands, water resources and the livestock that drank the contaminated water.” See Rebecca Tsosie, “Climate Change, Sustainability, and Globalization: Charting the Future of Indigenous Environmental Self-Determination,” 4 Envtl, & Energy L. & Pol’y J. 188, 220 (2009).
As I understand it, under the rule announced by the majority, a uranium mine located on non-Indian land but surrounded by land that constitutes a dependent Indian community would not be subject to federal regulation. I fail to see how such a rule comports with the applicable statute, the case law, or the federal government’s “distinctive obligation of trust ... in its dealings with these dependent and sometimes exploited people.” Morton v. Ruiz, 415 U.S. 199, 236, 94 S.Ct. 1055, 39 L.Ed.2d 270 (1974) (internal quotation marks omitted).
The proper standard for identifying a dependent Indian community under 18 U.S.C. § 1151(b) is a matter of utmost importance to Indian tribes, the states, *1185 and the federal government. I would affirm the EPA’s determination and the pan-til’s ruling, and I must dissent from the majority’s contrary conclusion. Additionally, in light of the disagreement among my colleagues, the continuing uncertainty in other courts about the proper application of Venetie in checkerboard areas like those at issue here, and the serious consequences of abandoning our well-established eommunity-of-referenee approach, I agree with Judge Ebel that a resolution of this issue by the United States Supreme Court is warranted.

. That statute prohibits the introduction of "any malt, spirituous, or vinous liquor, including beer, ale, and wine, or any ardent or intoxicating liquor of any kind whatsoever into the Indian country." 18 U.S.C. § 1154(b). It further provides that “(tjhe term 'Indian country’ as used in this section does not include fee-patented lands in non-Indian communities or rights-of-way through Indian reservations, and this section does not apply to such lands or rights-of-way in the absence of a treaty or statute extending the Indian liquor laws thereto.” 18 U.S.C. § 1154(c).