**STATE of Delaware**

v.

**GENERAL CHEMICAL CORPORATION,**
**Defendant.**

Superior Court of Delaware,
New Castle County.

Submitted: Sept. 19, 1988.
Decided: Oct. 25, 1988.

Kevin P. Maloney, Dept. of Justice, Wilmington, for the State.

Jeffrey S. Goddess, and John C. Laager, of Saul, Ewing, Remick & Saul, Wilmington, for defendant.

## OPINION

GEBELEIN, Judge.

This is a criminal prosecution for an alleged violation of 7 *Del.C.* § 6028.[1] The criminal charge was originally brought in the Court of Common Pleas. The State

---

1.  § 6028. Report of discharge of pollutant or air contaminant.

    (a) Any person who causes or contributes to the discharge of an air contaminant into the air or a pollutant into surface water, ground water or on land, or disposal of solid wastes, either in excess of any condition specified in any permit or variance duly issued by the Department, or in the absence of a permit or variance, shall report such an incident to the Department at such person's earliest opportunity after said discharge has occurred.

    (b) The reporting requirements under this section are in addition to, and not in lieu of, any other discharge reporting requirements found in any other state, federal, county or local government statutes, regulations or ordinances. For purposes of this section, the re-

quirement that all discharges be reported to the Department at the earliest opportunity shall mean that the person who causes or contributes to the discharge shall first contact the Department in person or by telephonic communication at said person's earliest opportunity after said discharge. At the Department's discretion, the Department may require said person to file a written report with the Department describing the facts and circumstances relating to the cause and results of the discharge in question. Any person who knowingly fails to comply with the requirements of this section shall, upon conviction, be fined not less than $500, nor more than $5,000, or imprisoned for 6 months, or both. The Superior Court shall have jurisdiction of offenses under this section.

*nolle prossed* the charge and then brought it by indictment in Superior Court on October 9, 1987. The defendant, General Chemical Corporation ("General"), filed a motion to dismiss on December 9, 1987, alleging four independent grounds requiring dismissal.[2] This is the Court's ruling on that motion.

### I.

On Sunday, June 28, 1987, at approximately 11:06 p.m., General discharged approximately 180 pounds of sulphur dioxide and 25 pounds of sulphur trioxide into the ambient air from its Claymont, Delaware facility. Plant personnel immediately responded to the situation. Unfortunately, at the time the emissions occurred, the electricity in the northern part of the facility including the office failed, hindering efforts to control the emissions. Jerry B. Piper, the plant supervisor on that shift, left the personnel who were attempting to control the leak and started calling off-site plant employees so that they could respond. Piper then called the adjacent Airco and Sun Oil Refineries. At 11:16, he called James Shepard, the Manager of Technical and Environmental Services, at his home. At 11:20, on Shepard's instructions, Piper phoned emergency 911 so that emergency fire personnel could respond to the situation by closing Route 13, where the plant is located, and ensuring that any endangered people would be safe. Piper made these phone calls by flashlight.

Electricity was restored at approximately 11:36 p.m., and Route 13 was being reopened at 11:50 p.m. when Shepard arrived on the scene. He had left his home immediately after Piper's phone call.

Upon arrival, Shepard spoke to Assistant Chief Edward Anderson of the Claymont Fire Company. Shepard's primary concern at this point was potential overflow of the sanitary sewer system caused by a buildup due to the loss of electricity. The plant employees also were attempting to secure

the electricity which had been restored at 11:36. The discharge ended two minutes later. As Shepard arrived, the sewer system was being restarted.

After his conversation with Chief Anderson, Shepard proceeded to the plant office and wrote a summary of events so that he could report to the Department of Natural Resources and Environmental Control's ("DNREC") 800 telephone number. As he was about to phone, John Mohrman of the DNREC State Emergency Response Team called him requesting an update of the situation. This phone call arrived at 12:02 a.m., June 29, approximately 56 minutes after the discharge began and 24 minutes after it ended. Shepard gave Mohrman a full report and at 12:04 a.m., Shepard phoned the DNREC 800 number.

Later in the day on June 29, Shepard gave Ali Mirzakhalili of the DNREC a full report during regular office hours. General submitted a written report on July 2, 1987. General was charged in August, 1987 with a violation of 7 *Del.C.* § 6028, which required that General report the discharge to the DNREC at General's "earliest opportunity". In its motion to dismiss, General argues four grounds for dismissal. The Court will address these arguments seriatim.

### II.

■ General first contends that 7 *Del.C.* § 6028, by employing the phrase "earliest opportunity" is vague, both on its face, and as applied to these facts. Although many terms are defined in 7 *Del.C.* § 6002 which is the definitional section of the subchapter containing § 6028, the term "earliest opportunity" is undefined. General contends that the phrase is ambiguous so as to create a problem as to the constitutionality of § 6028.

■ When a statute is challenged as being void for vagueness, the Court must first decide if concerns for First Amendment freedoms exist. When a First

---

**2.** A ground in the motion was that the indictment did not allege a "knowing" violation. The State amended the indictment by information by an uncontested motion, so that ground was

dropped. However, events that occurred after the initial briefing of the motion have created a new fourth ground.

Amendment issue exists, the Court must review the statute on its face to determine whether the vagueness itself will dissuade persons from constitutionally protected conduct. *See, Thornhill v. Alabama,* 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093 (1940). Clearly, a First Amendment issue does not exist in this case. Therefore, the Court makes no finding as to whether the statute is void upon its face.

■ When a statute being challenged for vagueness does not involve First Amendment freedoms, the statute must be examined in light of the facts of the case at hand. *Wright v. State,* Del.Supr., 405 A.2d 685 (1979), citing *U.S. v. Mazurie,* 419 U.S. 544, 95 S.Ct. 710, 42 L.Ed.2d 706 (1975); *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 495, 102 S.Ct. 1186, 1191, 71 L.Ed.2d 362 (1982). We need, therefore, only examine General's vagueness argument in light of all of the circumstances surrounding this case. *Wright, supra,* at 687.

The Supreme Court of the United States has pronounced the standard to be applied to a statute when it is being challenged for vagueness, and where the First Amendment is not an issue:

That the terms of a penal statute creating a new offense must be sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties is a well-recognized requirement, consonant alike with ordinary notions of fair play and the settled rules of law; and a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law [citations omitted]. [T]he decisions of the court, upholding statutes as sufficiently certain, rested upon the conclusion that they employed words or phrases having a technical or other special meaning, well enough known to enable those within its reach to correctly apply them [citations omitted], or a well-settled common-law meaning, notwithstanding an element of degree in

the definition as to which estimates might differ, [citations omitted] or, that for reasons found to result either from the text of the statutes involved or the subject with which they dealt, a standard of some sort was afforded. *Connally v. General Const. Co.,* 269 U.S. 385, 391–92, 46 S.Ct. 126, 127–28 [70 L.Ed. 322] (1926).

An issue in this case is whether the term "earliest opportunity" as used in the context of an environmental control reporting statute is clear enough that a person subject to the statute is sufficiently notified just what behavior will conform to the mandate of the statute. For if a person is not so notified, that person will be powerless to choose between lawful and unlawful conduct. *Wright, supra; State v. Braun,* Del.Supr., 378 A.2d 640 (1977). Enforcement of such a statute would violate an essential precept of due process.

■ This Court has an obligation in a case where a statute is being challenged for vagueness to construe the statute in such a manner as to avoid the infirmity. *State v. Colasuonno,* Del.Super., 432 A.2d 334 (1981); *Atlantis I Condominium Ass'n v. Bryson,* Del.Supr., 403 A.2d 711 (1979). This construction must be done consistent with the legislative intention, if possible. *Braun, supra. State v. 0.0673 Acres of Land, etc.,* Del.Supr., 224 A.2d 598 (1966).

The Water and Air Resources Act, 7 *Del. C.* Ch. 60, was implemented so that the State could control the development and utilization of the land, water, underwater, and air resources of the State. 7 *Del.C.* § 6001(a). Included in this control is the development and utilization of the State's natural resources to protect beneficial uses, to assure adequate resources for the future, to assure continued availability of resources for recreational purposes, to conserve wildlife and aquatic life, and to protect the State's natural resources from pollution. 7 *Del.C.* §§ 6001(a)(2–5). Legislative intent is further pronounced: "This chapter, being necessary for the welfare of the State and its inhabitants, shall be liberally construed in order to preserve the

land, air and water resources of the State." 7 *Del.C.* § 6020. Without a doubt, "[p]rotection of the environment is the paramount consideration." *State v. Getty Oil Co. (Eastern Operations), Inc.,* Del.Super., 305 A.2d 327, 329 (1973). *See also, Braun, supra.* Not only are the above sections relevant, but legislative amendments to the previous 7 *Del.C.* § 6028 aid in this interpretation. In the amendment to 7 *Del.C.* § 6028 effective July 9, 1986, the General Assembly added the very phrase at issue in this case. The prior version of the statute simply required that a person who contributed to a discharge of an air contaminant or pollutant above the amount allowed by permit or absent a permit report the incident to the DNREC. In 1986, the legislature added the phrase "at such person's earliest opportunity after said discharge has occurred." When a legislative body amends a prior enactment by a material change of the language, the Court presumes that a change in meaning was intended. *Daniel D. Rappa v. Englehardt,* Del.Supr., 256 A.2d 744, 746 (1969); *Winter v. Hindin,* Del.Super., 136 A. 280 (1926).

The State maintains that the term "earliest opportunity" has such a well-recognized meaning in ordinary English usage that persons of common intelligence do not have to guess as to the meaning and cannot differ as to its application. The State argues that in the context of 7 *Del.C.* Ch. 60, the term is equivalent to the term "immediately" or the phrase "as soon as the person is aware the discharge is occurring but before the person takes substantial steps to control the discharge or procure the safety of persons and property threatened by the discharge."

This Court agrees with the State that the term "earliest opportunity" has a well-recognized, common-sense meaning. But this Court does not agree that the meaning is the one being argued by the State. While there is no question that a primary consideration of the legislature in enacting environmental protection laws was to protect the natural resources of the State, there is similarly no question that every law the legislature enacts is for the benefit of the health, safety, and welfare of the inhab-

itants of the State. "Earliest opportunity" cannot be reasonably read to mean that a report must be made before the safety of those in imminent danger of harm is secured and the nature of the problem is apparent.

This Court has been unable to find a definition of the term "earliest opportunity" in statute or case law, but since the term has a common sense, well-known and well-understood meaning, perhaps this is to be expected. *Webster's New World Dictionary of the American Language* (2d Ed. 1982), defines the words comprising the term as follows:

Early

1. near the beginning of a given period of time or of a series, as of events; soon after the start

2. before the expected or customary time

3. in the far distant past; in ancient or remote times

4. in the near future; before much time has passed.

*Id.* at 438.

Opportunity

1. a combination of circumstances favorable for the purpose; fit time

2. a good chance or occasion, as to advance oneself.

*Id.* at 998.

These definitions, when read together, give the Court the meaning of the term "earliest opportunity." The word "earliest" when used in conjunction with "opportunity" can mean only "nearest to the beginning of a given period of time," that period beginning with the discharge. "Opportunity" can be interpreted as meaning either a "favorable combination of circumstances" or "a good occasion", which have the same meanings. The Court can ascertain the common sense, well-known meaning of the term by interpreting the definitions together. To this Court, the well-known, common sense meaning of the term "earliest opportunity" is "nearest to the time of the discharge that the combination of circumstances surrounding the discharge create a favorable time for report-

ing." This does not mean "immediately", nor does it mean that the reporting must be done in a specific period of time without regard to the attendant circumstances. The nature of pollution and environmental control statutes is that they must be flexible enough and adaptible enough to encompass the myriad of potential scenarios which could not have been foreseen by the legislature. *Braun, supra* at 643; *Fry Roofing Co. v. Pollution Control Board*, 20 Ill.App.3d 301, 314 N.E.2d 350, *cert. den.*, 420 U.S. 996, 95 S.Ct. 1438, 43 L.Ed. 2d 679 (1974).

■ By necessity, what is the earliest opportunity in one case will be too late in another. But while this Court cannot give a bright-line standard upon which the definition can be based, it can propose various non-exclusive factors for the direction of all persons who are subject to this reporting standard. These factors, in no particular order, include, but are not limited to,

1. the time of day or night that the discharge occurs;

2. the staffing on the location;

3. the ability of the on-site staff to judge the nature of and extent of the discharge;

4. the potential threat to the health and safety of employees necessitating immediate remedial action;

5. the potential threat to the health and safety of innocent bystanders including neighboring property owners and others who may by mere happenstance stumble upon the scene necessitating immediate remedial action;

6. the number and length of time of contacts to emergency response personnel made by the person subject to report;

7. the ability of the discharger to notify the DNREC in a quick, short-hand manner so that the overall response mechanisms can be used;

8. in short and most importantly, the overall circumstances surrounding the discharge.

■ Thus, it can be said that "earliest opportunity" must be defined as the "earliest time under all of the circumstances after immediate remedial safety measures have been taken at which a reasonable person could report" to DNREC.

While this Court can state with little reservation that if the first contact with the DNREC occurs, for example, hours after a release is controlled, it probably is not the "earliest opportunity", this Court cannot say whether in the circumstances of this case General reported at its "earliest opportunity". The issue is necessarily an issue of fact. Using the guidelines above, the finder of fact may determine whether the facts of each case show that the defendant reported at its "earliest opportunity." [3]

This Court has an obligation to construe a statute so as to avoid a possible infirmity. *Colasuonno, supra; Atlantis I, supra.* By presenting factors by which a person subject to reporting and a finder of fact may determine what conduct violates the statute, this Court has interpreted the statute so as to avoid a vagueness challenge given the circumstances of this case. Therefore, the Court holds that the statute being challenged here, 7 *Del.C.* § 6028, is not void for vagueness as applied to General in this case.

### III.

■ General next contends that the information should be dismissed because it merely tracks the language of the statute allegedly violated, and it does not allege the essential facts so that General could be "plainly and fully informed of the nature and cause of the accusation against" it. Del. Const. Art. I, § 7. The indictment in this case reads as follows:

The General Chemical Corporation, on or about the 28th day of June, 1987, in the County of New Castle, State of Delaware, did cause or contribute to the discharge of an air contaminant, sulfur dioxide and sulfur trioxide, into the air,

---

**3.** The Court's rendition of these non-exclusive factors certainly would not preclude the DNREC from promulgating rules or regulations setting forth standards more exact than these.

either in excess of any condition specified in any permit or variance duly issued by the Department or in the absence of a permit or variance and did knowingly fail to report such incident to the Department of Natural Resources and Environmental Control at the earliest opportunity after said discharge occurred, in violation of 7 *Del.C.* sec. 6028(a) and (b).

Superior Court Criminal Rule 7(c) states that the indictment "shall be a plain, concise and definite written statement of the essential facts constituting the offense charged." The reason that an indictment must be sufficient is two-fold. First, it must put the defendant on notice of what he is to defend. Then, it must be effective to preclude subsequent prosecution for the same offense. *Malloy v. State*, Del.Supr., 462 A.2d 1088, 1092 (1983); *State v. Lasby*, Del.Super., 174 A.2d 323, 324 (1961), *aff'd*, Del.Supr., 185 A.2d 271 (1962). The Delaware Supreme Court has held that an indictment is sufficient if it is drawn with sufficient particularity as to permit the defendant reasonably (1) to know the charge, and (2) to prepare a defense. *Owens v. State*, Del.Supr., 449 A.2d 200 (1982); *Gray v. State*, Del.Supr., 441 A.2d 209 (1981).

In this case, the information informs General of the charge against it. General knows from the information that the charge concerns the discharge of sulphur dioxide and sulphur trioxide and a knowing failure of General to report the discharge to the DNREC at its earliest opportunity. The essential facts of the offense are that a discharge occurred and a knowing reporting of the discharge was not made at the person responsible's earliest opportunity. These facts are alleged sufficiently in this case so that the purposes of an indictment, to notify and protect the defendant, are met. *See Malloy, supra* at 1093; *State v. Allen*, Del.Super., 112 A.2d 40, 42 (1955). If the crime is alleged in the words of the statute, it is generally sufficient. *State v. DiMaio*, Del.Super., 185 A.2d 269, 271 (1962).

If General desires to have more particular facts concerning specifics as to what the State may consider to be "earliest op-

portunity", it may move for the State to file a Bill of Particulars in accordance with Superior Court Criminal Rule 7(f). *DiMaio, supra* at 271. The State may not use the Bill to cure an otherwise defective indictment, *State v. Deedon*, Del.Supr., 189 A.2d 660 (1963), but in this case the Court has held that the indictment is not defective.

### IV.

■ General next argues that it has been deprived a fair warning and has been misled by actions of the DNREC, so that General believed it was acting in conformance with the statute when it attempted to control the discharge before contacting the DNREC. Fair warning of what behavior is criminal can be found in either the statute itself, in regulations of the particular agency, in the record of the agency in enforcing the statute or regulations, or in case law.

The interpretation of the statute itself must of necessity be flexible because of factors including those cited above. This argument hinges on the interpretation given to the term "earliest opportunity", which this Court has done above.

The statute itself does not define the term "earliest opportunity", but viewed in light of the above-cited policies for environmental protection laws, it must mean "earliest reasonable opportunity". The body of laws concerning environmental protection could require only this interpretation. The statute itself, when read with other statutes in the general scheme, gives fair warning of what the term requires.

Unfortunately, the DNREC has no regulations on the subject, and the DNREC has not established a record of enforcement of 7 *Del.C.* § 6028. Generally, there is no more convincing interpretation of a statute than a long-standing, uniform administrative practice over a period of years. *Wisconsin v. Illinois*, 278 U.S. 367, 49 S.Ct. 163, 73 L.Ed. 426 (1929). The statute in question here was not in effect for a number of years before the incident. The Court should give the construction of a term by an administrative agency the highest respect, especially when the construc-

tion is contemporaneous with the first workings of the statute. *Power Reactor Development Co. v. International Union of Electrical, R. & M. Workers,* 367 U.S. 396, 81 S.Ct. 1529, 6 L.Ed.2d 924; 2 Am. Jur.2d *Administrative Law,* § 194. Similar to the stand of Justice Potter Stewart when viewing hard-core pornography in *Jacobellis v. Ohio,* 378 U.S. 184, 197, 84 S.Ct. 1676, 1683, 12 L.Ed.2d 793 (1964), in this case the DNREC takes the position that it will not and cannot further define what the term "earliest opportunity" means, but "[they] know it when [they] see it." The DNREC knows that it has not seen a violation of the standard before this case, but it knows that under the circumstances of this case, it sees a violation here. Given that the Court must review the warning given under an "overall circumstances" approach, this Court cannot say that the statute and the DNREC in this case did not give fair warning to General that by waiting almost an hour to report, it might be violating the reporting statute. In this case, this Court shall give deference to the construction of the statute by the DNREC, although the Court has tempered the DNREC's construction by including various factors for the discharger's analysis.[4] But under the circumstances of this case, General's argument as to the lack of fair warning must fail.

General argues that even the literature distributed by the DNREC does not give fair warning to a discharger as to when notification must take place. The DNREC distributes a booklet entitled, "DNREC Hazardous Substance Incident Reporting." The introduction to this booklet reads as follows:

> The purpose of the state and federal incident reporting requirements is to allow the proper authorities to respond and take action to protect human health and the environment in the event of a potentially serious release of hazardous substances. Through this process, sole responsibility for initiating such responses

at the time of a release is shared and coordinated with federal, state and local authorities so that an informed decision and response can be made.

> This booklet is intended to outline state and federal incident reporting requirements and to make facility owners/operators aware of the agencies which must be notified in the event of a release or discharge.

In fact, the booklet misquotes 7 *Del.C.* § 6028 not once, but twice, as requiring reporting at the "earliest *convenience*". The booklet also contains a chart at page four in which some circumstances are outlined to assist a discharger so he knows to whom and when to report a discharge. The chart, while stating that the report to the DNREC must be at the earliest opportunity, states that when, for example, an extremely hazardous substance is released and is not confined to the site, notification to the DNREC and the NRC must be done "immediately". The DNREC does not allege here that General is guilty of not reporting "immediately". It alleges that the reporting was not at General's "earliest opportunity", as defined by the "we know it when we see it" approach. This Court cannot say that when General's foreman on site made at least two phone calls 40 minutes before the DNREC was notified, General could not have phoned the DNREC's 800 telephone number to give even a thumbnail report. Whether, given all the facts and circumstances and the factors outlined above, the reporting in this case occurred at General's earliest reasonable opportunity is a question for the trier-of-fact.

## V.

■ General's final argument is that the statute for which it is being prosecuted for violating has been repealed by the General Assembly. After this prosecution began, the General Assembly altered 7 *Del.C.* § 6028 with House Bill 330 so that it cur-

---

**4.** This is not to say that the DNREC should not promulgate rules and regulations to more fully guide persons subject to its reporting requirements. Without a doubt the DNREC is better

equipped to determine those factors which would make reporting more critical in certain situations.

rently reads, with additions emphasized and deletions stricken, as follows:

Section 1. Amend Section 6028, Chapter 60, subchapter II, Title 7 of the Delaware Code by deleting said Section in its entirety and substituting in lieu thereof the following:

§ 6028. *Report of a discharge of a pollutant or an air contaminant.*

(a) Any person who causes or contributes to the discharge of an air contaminant into the air or a pollutant, *including petroleum substances,* into surface water, ground water, or on land, or disposal of solid wastes either in excess ~~of any condition specified in any permit or variance duly issued by the Department, or in the absence of a permit or variance,~~ *of any reportable quantity specified under either regulations implementing Section 102 of the Federal Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, Section 311 of the Clean Water Act of 1980 as amended, or Department regulations, whichever are more strict,* shall report such an incident to the Department at such person's earliest opportunity after said discharge has occurred.

(b) The reporting requirements under this Section are in addition to, and not in lieu of, any other discharge reporting requirements found in any other state, federal, county, or local government statutes, regulations, or ordinances. ~~For purposes of this section, the requirement that all discharges be reported to the Department at the earliest opportunity shall mean that the person who causes or contributes to the discharge shall first contact the Department in person or by telephonic communication at said person's earliest opportunity after said discharge.~~

(c) *For the purpose of this Section, notification to the Department can be in person or by telephonic communication.* At the Department's discretion, the Department may require said person to file a written report with the Department describing the facts and circumstances relating to the cause and the results of the discharge in question.

*(d) Discharges of an air contaminant or pollutant (including petroleum substances) that are wholly contained within a building are exempt from the reporting requirements.*

*(e)* Any person who knowingly fails to comply with the requirements of this Section shall, upon conviction, be fined not less than $500, nor more than $5,000, or imprisoned for six months, or both. The Superior Court shall have jurisdiction of offenses under this Section.

Neither General nor the DNREC argues that the general rule is that when the legislature repeals a statute, all prosecutions which have not attained a final judgment must be terminated. *Angelini v. Court of Common Pleas,* Del.Supr., 205 A.2d 174, 175 (1964); *Harris Enterprises, Inc. v. State,* Del.Supr., 408 A.2d 284 (1979); *State v. Patnovic,* Del.Super., 129 A.2d 780 (1957); *State v. McGonigal,* Del.Super., 189 A.2d 670 (1963); *State v. Haskins,* Del.Super., 525 A.2d 573 (1987).

The DNREC, however, does argue that H.B. 330 does not "repeal" 7 *Del.C.* § 6028, but by its own language, "amends" the statute.

This argument does not withstand scrutiny. The very section of H.B. 330 upon which the DNREC seeks to rely states that the amendment deletes § 6028 "in its entirety" and replaces it with language contained in H.B. 330. Clearly when the legislature deletes a section "in its entirety", the legislature is repealing that prior section even if the repeal is couched in terms of an amendment.

The general rule that a repeal of a statute voids all prosecutions pending under it has exceptions. The legislature may always include an express savings clause in the new statute. Absent such an express savings clause, this Court must determine if a savings clause should be implied in the new statute. The determination requires

an analysis of the intent of the legislature. *Angelini; Harris; Patnovic; McGonigal; Haskins, supra.*

The easy exception to the general rule is when a penal statute is replaced by a penal statute which increases the penalties for an offense. *Patnovic,* at 782; *Haskins,* at 575. In that case an absurd outcome would result if persons prosecuted could be set free when the intent of the legislature was clear that they should continue to be punished for the exact same behavior, and to be punished more severely. Also, in a case such as *Angelini, supra,* where the legislature replaces statutes with the stated purpose to make "Rules of the Road" uniform with other states, there is an implication that the legislature would intend prosecutions under the former statute to continue.

No such savings clause can be implied in H.B. 330. It does not, as the DNREC argues, make minor changes in the statute while leaving the statutory language and scheme in place. It effects a complete change in the statutory scheme. It redefines the offense for which General is charged. The offense under the former § 6028 was for knowing failure to report a discharge "either in excess of any condition specified in any permit duly issued ... or in the absence of a permit" at the earliest opportunity. The offense defined by H.B. 330 is completely different. It now is a failure to report a discharge "of any reportable quantity specified under either regulations implementing Section 102 of the Federal Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended [the Superfund], Section 311 of the Clean Water Act of 1980 as amended, or Department [DNREC] regulations, whichever are more strict." Nowhere in H.B. 330 are DNREC permits mentioned, and nowhere in § 6028 was mentioned the Superfund, the Clean Water Act, or Department regulations.[5]

This change in the statutory scheme might not be fatal if the offense charged under the former statute remained an offense under the replacement statute. Such a situation could potentially show legislative intent that a savings clause be implied. In effect, the statute of which a defendant is charged with violating would be in continuous operation. *Harris, supra* at 286.

Because the current statutory scheme, by incorporating federal statutes and guidelines, is extraordinarily complex, the Court requested that the parties submit supplemental memoranda to show whether or not the discharge of sulphur dioxide and sulphur trioxide under the circumstances existing in this case would constitute a reportable incident under the current statute. The reply by the DNREC was somewhat less than satisfying.[6] It seems from the response filed (Appendix "A" to this opinion) that the DNREC itself does not know whether sulphur dioxide or sulphur trioxide are reportable substances included in the current statutory scheme. Since the DNREC and the Department of Justice with their expertise cannot tell if a discharge of these substances would be required to be reported under the new act *a fortiorari,* a potential defendant cannot be prosecuted for "knowingly" failing to report such a discharge.

This Court holds that H.B. 330 repealed the former § 6028 and that no savings clause may be implied in the replacement statute for those discharges which are not now reportable. Thus, this prosecution begun under the former § 6028 may not be continued.

The Court hereby GRANTS the motion to dismiss the indictment.

IT IS SO ORDERED.

### APPENDIX A

16 September 1988

The Honorable Richard S. Gebelein
Superior Court of Delaware
Public Building
11th and King Streets
Wilmington, Delaware 19801

Re: State v. General Chemical Corp.

---

**5.** Which, interestingly enough, do not exist as of this writing.

**6.** General submitted a position that this discharge would not now require reporting.

Cr. A. No. IN87–10–0995

Dear Judge Gebelein:

Your Honor has asked whether the defendant's emissions which are the subject of the above-captioned criminal matter would have had to be reported under the current release notification law found at 7 *Del.C.* sec. 6028. Seven *Del.C.* sec. 6028 requires the reporting of the discharge of an air contaminant into the air ... in excess of any reportable quantity specified under either regulations implementing Section 102 of the Federal Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA") as amended, Section 311 of the Clean Water Act of 1980 as amended, or Department regulations whichever are more strict.

Pursuant to Your Honor's inquiry, I conducted an investigation through the Department of Natural Resources and Environmental Control's RCRA Branch. The Department's position was that there is uncertainty as to whether sulfur dioxide meets the RCRA characteristic test for corrosivity. If it did meet such tests, it would require notification under CERCLA as an unlisted characteristic hazardous substance. The Department was unable to assure me, however, that sulfur dioxide is a RCRA hazardous substance. Accordingly, I am unable to state that the quantity of emission from defendant's plant would have to be reported under the current law.

The Department does not have any regulations which would require the reporting of this release. It is unfortunate that this void exists. The Department assures me that it will be issuing regulations in the future to fill this void.

Respectfully submitted,

(s) Kevin P. Maloney
Kevin P. Maloney
Deputy Attorney General